Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
12/02/2016 09:10 AM CST

In re Adoption of Micah H., a minor child.
Daniel H. and Linda H., appellants,
v. Tyler R., appellee.

___ N.W.2d ___

Filed December 2, 2016.    No. S-15-1080.

1. **Judgments: Jurisdiction.** A jurisdictional issue that does not involve a factual dispute presents a question of law.
2. **Juvenile Courts: Appeal and Error.** An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings.
3. **Statutes: Appeal and Error.** To the extent an appeal calls for statutory interpretation or presents questions of law, an appellate court must reach an independent conclusion irrespective of the determination made by the court below.
4. **Jurisdiction: Appeal and Error.** Before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether it has jurisdiction over the matter before it.
5. **Jurisdiction: Final Orders: Appeal and Error.** For an appellate court to acquire jurisdiction over an appeal, there must be a final order or final judgment entered by the court from which the appeal is taken.
6. **Judgments: Final Orders: Words and Phrases.** A judgment is the final determination of the rights of the parties in an action.
7. ____: ____: ____. A final judgment is one that disposes of the case either by dismissing it before a hearing is had upon the merits, or after trial by rendition of judgment for the plaintiff or defendant.
8. **Indian Child Welfare Act: Federal Acts: Child Custody.** The applicability of the federal Indian Child Welfare Act of 1978 and the Nebraska Indian Child Welfare Act to a child custody proceeding turns not on the Indian status of the person who invoked the acts but on the status of the child involved in the proceeding.
9. **Indian Child Welfare Act: Federal Acts: Parental Rights.** To the extent that the Nebraska Indian Child Welfare Act provides a higher

standard of protection to the rights of the parent or Indian custodian of an Indian child under the federal Indian Child Welfare Act of 1978, the Nebraska Indian Child Welfare Act controls.

10. **Indian Child Welfare Act: Parental Rights: Parent and Child.** "Active efforts" must be made to unite the Indian child with both biological parents, regardless of whether they are Indian.

Appeal from the County Court for Saunders County: Patrick R. McDermott, Judge. Reversed and remanded.

John H. Sohl for appellants.

Jennifer D. Joakim for appellee.

Heavican, C.J., Wright, Miller-Lerman, Cassel, Stacy, Kelch, and Funke, JJ.

Kelch, J.

## I. NATURE OF CASE

This case presents the issue of whether the "active efforts" and "serious emotional or physical damage" elements of the federal Indian Child Welfare Act of 1978 (ICWA)[1] and the Nebraska Indian Child Welfare Act (NICWA)[2] apply to provide increased protection to the parental rights of a non-Indian, noncustodial parent of an "Indian child."

## II. FACTS

Daniel H. and Linda H., the maternal grandparents and guardians of Micah H., a minor child, appeal the order of the Saunders County Court denying their petition to adopt Micah. In their petition, Daniel and Linda alleged, among other things, that the child's mother (their daughter), Allison H., had consented to the adoption; that the father, Tyler R., had abandoned Micah; and that terminating Allison's and Tyler's parental rights was in Micah's best interests. In Tyler's answer, he alleged that Micah was an "Indian Child" pursuant to

[1] 25 U.S.C. §§ 1901 to 1963 (2012).

[2] Neb. Rev. Stat. §§ 43-1501 to 43-1516 (Reissue 2016).

ICWA and NICWA. Because neither party disputed that Micah met the "Indian child" definition under both acts, the county court applied those acts, which provide heightened protection to the rights of parents and tribes in proceedings involving custody, termination of parental rights, and adoption of Indian children.[3] After a hearing on Daniel and Linda's petition, the county court found that it was compelled to deny the petition, because it was "unable to find beyond a reasonable doubt that [Tyler] has abandoned the child."

## 1. Background

Micah's mother, Allison, was placed with Daniel and Linda when she was 4 years old. Allison is a member of the Oglala Sioux Tribe. Daniel and Linda are not members of an Indian tribe, but they took measures to help Allison understand her Indian heritage. At the hearing on the petition, Linda testified that the family kept Native American artifacts in their home, read Native American books and literature to Allison, and took her to powwows and reservations. Linda also testified that in her practice as a nurse, she underwent training to become "trans-culturally certified," with a focus on Native American culture.

When Allison was 17 years old, she first met Tyler. She had run away from home with a friend, and the two of them went to Tyler's mother's house. Allison testified that Tyler's mother provided Allison with alcohol and that Tyler provided her with marijuana, which they smoked in the basement. Allison testified that Tyler's mother was aware that the marijuana was being used. At some point that night, Tyler and Allison had sexual intercourse. As a result of that sexual contact, Micah was born in September 2007. After his birth, Allison and Micah lived in Daniel and Linda's home.

In June 2008, when Micah was 9 months old, the State initiated an action against Tyler to establish paternity and child

---

[3] See *In re Adoption of Kenten H.*, 272 Neb. 846, 725 N.W.2d 548 (2007).

support. Prior to that time, Tyler was not aware of Micah's existence. On July 2, 2010, the county court entered a decree of paternity, custody, and child support. The decree granted Allison full legal and physical custody. It ordered Tyler to pay child support of $100 per month beginning August 1, 2010. The decree also awarded Tyler parenting time. Supervised visitation was to occur every other weekend, 1 to 2 weeks in the summer, and on alternating holidays.

### (a) Tyler's Visitation

Linda testified that Tyler's first visit with Micah occurred at her home in November 2008. She testified that until the county court awarded Tyler parenting time in 2010, Tyler visited "more than once a year," but not always more than once a month. After Tyler was awarded parenting time, he saw Micah every other week to every 3 weeks. Under the decree, Tyler's visits with Micah were to be supervised by his mother or another suitable person approved by Allison.

Tyler's mother testified that the visits between Tyler and Micah were "great." She stated that she observed a loving relationship between them and that Micah appeared to enjoy himself and look up to Tyler. Tyler also testified about his parenting time, naming various activities that he and Micah enjoyed together. According to Tyler, at some point, Daniel and Linda started denying him visits for no reason.

Linda testified that the face-to-face visits ceased on May 8, 2011, for two reasons. There were concerns, first, that Tyler's visits were not being supervised as ordered, and second, that inappropriate sexual behavior displayed by Micah was attributable to Tyler. At some point, Allison's attorney wrote Tyler a letter stating that Allison was restricting Tyler's parenting time because of Micah's inappropriate behaviors.

On the issue of whether Tyler's visits were being supervised, Linda testified that sometime in February 2011, Tyler came to Daniel and Linda's house to pick Micah up for a visit, and his mother was not with him. When Allison saw that Tyler's

mother was not present, she told him that he could not take Micah. Linda testified that she had also suspected that the visits were sometimes unsupervised because Micah would talk about "being with Daddy Tyler downstairs" and going "up to the big house where [Tyler's mother] was." Tyler and his mother denied that the visits were ever unsupervised.

As for Micah's inappropriate sexual behavior, Linda stated she had observed that "when Micah would hug or kiss, he would say things like, ew-w, baby, baby and rub against." Allison testified that Micah "took Buzz and Woody [dolls representing characters from a children's movie] and talked about Buzz kissing his penis."

Daniel also testified about some of Micah's questionable behavior. Daniel testified that he was supervising Micah's bath one night. Because Micah is uncircumcised, Daniel reminded Micah that he needed to pull the foreskin back to clean himself. Daniel testified that Micah said, "oh, this is how guys make white stuff come out of their penis," and that Micah then started making a lot of movement on his penis. When Daniel asked Micah how he found out about that, Micah said, "from Daddy Tyler," and "from movies." At that time, Micah was 3 or 4 years old.

Tyler's testimony supports Linda's claim that Tyler's last face-to-face visit was May 8, 2011. He testified that prior to his incarceration in February 2012, he did not have face-to-face contact with Micah for what "could have been" a year or more. Linda testified that to her knowledge, Tyler did not request visitation with Micah after that time. Tyler, however, claims that at some point, he filed a contempt action in county court to allow visitation, and that the matter was pending.

Tyler testified that while in prison, he wrote numerous letters to Micah addressed to Daniel and Linda's residence and that he sometimes received a response. Tyler's mother testified that Tyler had sent cards, drawings, and puzzles for Micah to her residence.

### (b) Child Support

Tyler was unable to pay the full monthly child support obligation after he was imprisoned in February 2012 for motor vehicle homicide. While in prison, Tyler requested that the State withhold his prison income to satisfy his child support obligation. However, Tyler's request was denied because his income was too low to qualify for withholding. The amount was also insufficient to cover the full child support obligation. Tyler testified that he then sent his prison income to his mother, who supplemented the income with her own funds, to pay the child support obligation on Tyler's behalf. The county court found that it was "the paternal grandmother, not the father, who pays the child support for the child." Tyler's child support payment history reflects that between July 1, 2008, and May 26, 2015, $7,517.20 had been paid and that Tyler owed $816.12.

### (c) Daniel and Linda Appointed as Micah's Guardians

Allison has struggled with addiction since she was 15 years old. While she was in Daniel and Linda's custody and control, they sought counseling for her. Allison also received alcohol and drug counseling and treatment prior to the hearing on Daniel and Linda's petition. Although Allison had been sober for 7 months prior to the hearing, she relinquished her rights at the hearing. When asked why she wanted to do that, Allison stated, "Because I have struggled with alcohol on and off for the last 11 years of my life."

The evidence shows that Micah has spent the majority of his life residing with Daniel and Linda. Linda testified that Micah resided with her and Daniel from his birth in September 2007 to October 2008. From October 2008 to January 2009, Micah lived with Allison in an apartment, but had almost daily contact with Daniel and Linda. After that, Allison and Micah lived with Tyler at his mother's residence for 7 to 10 days before moving back to Daniel and Linda's house. After that, Allison

and Micah moved back with Daniel and Linda and lived there until February 2011, at least "most of that time." The evidence does not reflect where Micah lived from February to October 2011, but from November 2011 to the time of the hearing in June 2015, Micah resided with Daniel and Linda again. At that time, Allison had asked Daniel and Linda to care for Micah because she was struggling with addiction.

In March 2012, Daniel and Linda took action to become joint guardians of Micah, and in April, they were appointed.

### (d) Tyler's Mother's Visitation

After the guardianship commenced in 2012, Daniel and Linda offered Tyler's mother visitation with Micah. Tyler's mother testified that while Micah was visiting her, she would call Tyler in prison and allow the two to talk. She testified that these telephonic visits ceased when Linda told her that Micah was not allowed to speak to Tyler.

Linda testified that after visits with Tyler's mother, Micah began to exhibit some anxious behavior that caused her concern. She said Micah would cry, tug on his clothing, and make some unusual and rapid hand movements under his chin. She said Micah would ask her and Daniel if he had to "go to that jail place to visit Daddy Tyler." In response to these behaviors, Daniel and Linda obtained a mental health evaluation for Micah with a child psychologist. Tyler's mother testified that she had not taken Micah to visit Tyler in prison.

In late 2013, after Tyler's mother filed for grandparent visitation, Daniel and Linda stopped allowing Micah to visit her at her house.

### 2. Hearing on Adoption Petition

On September 10, 2014, Daniel and Linda filed a complaint for termination of parental rights and a petition to adopt Micah in Saunders County Court. Daniel and Linda served a copy of their complaint on Allison, Tyler, and the president of the Oglala Sioux Tribe, as required by the notice provisions of

ICWA and NICWA.[4] Allison consented to the adoption, and the tribe did not intervene.

However, on October 24, 2014, Tyler filed an answer and objection to the petition for adoption. In his answer, Tyler alleged that Micah is an "Indian Child" pursuant to ICWA and NICWA and that Daniel and Linda had failed to plead or otherwise satisfy the requirements of those acts. Those requirements will be discussed at length within the analysis section of this opinion.

The hearing on Daniel and Linda's petition was held on June 4, 2015. Among other things, evidence related to Tyler's fitness as a parent was introduced, including evidence of Tyler's history of drug and alcohol abuse and Tyler's criminal record. Allison testified that Tyler had used alcohol, marijuana, and cocaine in her presence; that he had used illegal substances in her presence during the 7 to 10 days that she and Micah resided with Tyler; and that Tyler had been involved in drug deals involving marijuana and cocaine. Allison also testified that Tyler had confided in her that he had once given cocaine to a female at a party who later died from a drug overdose.

Tyler has had numerous drug-related and alcohol-related charges and convictions. In 2006, he was convicted of being a minor in possession. In 2008, he was convicted of driving under the influence (DUI) and of two separate charges of being a minor in possession. In 2010, he was convicted of driving under suspension, possession of marijuana (more than an ounce but less than a pound), and attempted assault on a police office. He was also charged with DUI, which was later amended to willful reckless driving. In 2012, Tyler was again charged with DUI, but that charge was later amended to motor vehicle homicide. As a result of his 2012 conviction, Tyler was incarcerated in the Nebraska State Penitentiary, where he continues to serve his sentence. Tyler will not

---

[4] See 25 U.S.C. § 1912(a) and § 43-1505(1).

be eligible for parole until 2019, when Micah will be 12 years old.

Tyler testified that while in prison, he has attended an Alcoholics Anonymous program, "Asatrú" religious programs, and language programs. At the time of the hearing, Tyler was employed in the prison's kitchen and earned approximately $87 per month.

After the hearing, the county court denied Daniel and Linda's petition. Applying ICWA, the court concluded, "By nearly any other standard[,] the court would not hesitate to grant adoption but under the unique requirements of ICWA and the burden of proof beyond a reasonable doubt that Court is compelled to deny the petition." The county court found, "While [Tyler] is certainly not a fit parent at this time, the court is unable to find beyond a reasonable doubt that he has abandoned the child."

Daniel and Linda now appeal.

## III. ASSIGNMENTS OF ERROR

Daniel and Linda assign (1) that the county court erred in finding that ICWA applied at the request of Tyler, a non-Indian, and (2) that the county court erred in applying a higher burden of proof to the abandonment element and finding that Daniel and Linda failed to show that Tyler had abandoned Micah.

## IV. STANDARD OF REVIEW

[1] A jurisdictional issue that does not involve a factual dispute presents a question of law.[5]

[2] An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings.[6]

[3] To the extent an appeal calls for statutory interpretation or presents questions of law, an appellate court must reach an

---

[5] *In re Adoption of Madysen S. et al.*, 293 Neb. 646, 879 N.W.2d 34 (2016).

[6] *In re Interest of Jorge O.*, 280 Neb. 411, 786 N.W.2d 343 (2010).

independent conclusion irrespective of the determination made by the court below.[7]

## V. ANALYSIS

### 1. Jurisdiction

[4-7] Before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether it has jurisdiction over the matter before it.[8] For an appellate court to acquire jurisdiction over an appeal, there must be a final order or final judgment entered by the court from which the appeal is taken.[9] A judgment is the final determination of the rights of the parties in an action.[10] We have said that a final judgment is one that disposes of the case either by dismissing it before a hearing is had upon the merits, or after trial by rendition of judgment for the plaintiff or defendant.[11] Conversely, every direction of a court or judge, made or entered in writing and not included in a judgment, is an order.[12] The final judgment in proceedings under an adoption petition is an order granting or denying adoption.[13] Here, unlike in *In re Adoption of Madysen S. et al.*,[14] the county judge, even though the hearing had been bifurcated, denied the entire adoption petition filed by Daniel and Linda. Therefore, we have jurisdiction to proceed.

### 2. Applicability of ICWA and NICWA

Generally stated, the substantive portions of ICWA and the corresponding provisions of NICWA provide heightened

---

[7] *Id.*

[8] *In re Adoption of Madysen S. et al., supra* note 5.

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] *Id.*

protection to the rights of parents and tribes in proceedings involving custody, termination of parental rights, and adoption of Indian children.[15] ICWA was enacted by Congress in 1978

> to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs.[16]

In 1985, NICWA was enacted "to clarify state policies and procedures regarding the implementation by the State of Nebraska of [ICWA]."[17]

In the present case, Daniel and Linda argue that the county court erred in finding that ICWA applied when invoked by a non-Indian father; they argue that "[o]nly an Indian Tribe or parental Indian member of an Indian family may invoke those statutory protections."[18] Daniel and Linda do not offer any authority directly supporting these assertions, but argue that the purpose of ICWA is not served by applying it to protect the rights of a non-Indian father.

[8] We note that the plain language of ICWA and NICWA does not provide for any exclusion when raised by a non-Indian parent. In fact, under NICWA, "[p]arent means any biological parent or parents of an Indian child or any Indian person who has lawfully adopted an Indian child, including adoptions under tribal law or custom."[19] Rather, the applicability of ICWA and NICWA to an adoption proceeding turns not

---

[15] See *In re Adoption of Kenten H., supra* note 3.

[16] 25 U.S.C. § 1902.

[17] § 43-1502.

[18] Brief for appellants at 9.

[19] § 43-1503(14).

on the Indian status of the person who invoked the acts but on whether an "Indian child" is involved.[20] Here, there was no dispute that Micah meets the statutory definition of an "Indian child." Accordingly, the county court correctly found that ICWA and NICWA applied, but it did not determine whether certain provisions of ICWA and NICWA applied to Tyler.

Although we find that ICWA and NICWA apply to this adoption proceeding, this is not to say that every provision of ICWA and NICWA applies to a non-Indian parent. As we shall discuss later, certain provisions of ICWA or NICWA may not be applicable to a non-Indian parent.

### 3. Abandonment

In its application of NICWA, the county court found that it was compelled to deny the adoption petition, because "the court [was] unable to find beyond a reasonable doubt that [Tyler] has abandoned the child." However, NICWA does not require the "beyond a reasonable doubt" standard for the abandonment element.

For a court to grant an adoption petition, Neb. Rev. Stat. § 43-104(1) (Reissue 2016) requires that, unless the adoption falls within one of the exceptions set forth in § 43-104(2), the biological parents of the child must execute written consent to the adoption. Here, Tyler has not consented, but Daniel and Linda seek to establish an exception, i.e., that under § 43-104(2)(b), Tyler has "abandoned the child for at least six months next preceding the filing of the adoption petition."

In addition to the requirements under the adoption statutes, NICWA adds two elements to adoption proceedings involving Indian children. One of those elements requires a determination

---

[20] See §§ 43-1504 and 43-1505. See, also, *In re Adoption of Kenten H., supra* note 3, 272 Neb. at 853, 725 N.W.2d at 554 ("[a]pplicability of these protective statutes depends on whether the proceedings involve an 'Indian child'"); *In re Interest of J.L.M. et al.,* 234 Neb. 381, 396, 451 N.W.2d 377, 387 (1990) ("[f]or application of the Indian Child Welfare Act to proceedings for termination of parental rights, the proceedings must involve an Indian child within the purview of the act").

to be made "beyond a reasonable doubt."[21] However, abandonment in adoption proceedings need only be proved by clear and convincing evidence.[22] Only the "serious emotional or physical damage" element imposed by NICWA must be proved beyond a reasonable doubt.[23]

Because the county court applied the incorrect burden of proof to the abandonment element, we must remand the cause for further proceedings and for a redetermination applying the correct standard. However, we first discuss the two additional elements imposed by NICWA, because issues involving those elements may recur on remand. An appellate court may, at its discretion, discuss issues unnecessary to the disposition of an appeal where those issues are likely to recur during further proceedings.[24]

### 4. ACTIVE EFFORTS

First, § 43-1505(4) and its federal counterpart, 25 U.S.C. § 1912(d), set forth an "active efforts" element. We discuss both federal and state statutes. The federal statute provides:

> Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.[25]

This statute was interpreted by the U.S. Supreme Court in *Adoptive Couple v. Baby Girl*.[26] In *Baby Girl*, the adoptive

---

[21] See § 43-1505(6).

[22] See *In re Application of S.R.S. and M.B.S.*, 225 Neb. 759, 408 N.W.2d 272 (1987).

[23] See *In re Interest of Walter W.*, 274 Neb. 859, 744 N.W.2d 55 (2008).

[24] *Fitzgerald v. Community Redevelopment Corp.*, 283 Neb. 428, 811 N.W.2d 178 (2012).

[25] 25 U.S.C. § 1912(d).

[26] *Adoptive Couple v. Baby Girl*, ___ U.S. ___, 133 S. Ct. 2552, 186 L. Ed. 2d 729 (2013).

parents of a young Indian girl petitioned the U.S. Supreme Court for certiorari after a South Carolina court interpreted provisions of the federal act to require that the girl be removed from her adoptive parents' care and placed with her biological father. Her father, a member of the Cherokee Nation, had previously attempted to relinquish custody, and the child had never met him. The U.S. Supreme Court reversed, interpreting the "active efforts" provision of ICWA to apply "only in cases where an Indian family's 'breakup' would be precipitated by the termination of the parent's rights."[27] Because the Indian father in *Baby Girl* had never had custody of (or even met) the Indian child, the court determined that there was no Indian family to break up.[28] Therefore, the court concluded that the "'active efforts'" element did not apply to the termination of the Indian father's parental rights.[29]

[9] Applying the U.S. Supreme Court's interpretation of the "active efforts" element, the "breakup" of an Indian family would not be precipitated by the termination of Tyler's parental rights, because Tyler has never been part of an "Indian family" to break up. Thus, ICWA's "active efforts" element and the corresponding part of NICWA's "active efforts" element are not applicable. However, this does not end our discussion of whether NICWA's "active efforts" provision applies to the termination of Tyler's parental rights, because the Legislature amended NICWA after *Baby Girl*.[30] To the extent that NICWA provides a higher standard of protection to the rights of the parent or Indian custodian of an Indian child under ICWA, NICWA controls.[31]

The amended version of § 43-1505(4) provides, in relevant part:

---

[27] *Id.*, 133 S. Ct. at 2562.

[28] *Id.*

[29] *Id.*

[30] See 25 U.S.C. § 1921 and § 43-1503(1).

[31] 25 U.S.C. § 1921.

> Any party seeking to effect a foster care placement
> of, or termination of parental rights to, an Indian child
> under state law shall satisfy the court that active efforts
> have been made to provide remedial services and reha-
> bilitative programs designed to prevent the breakup of
> the Indian family *or unite the parent or Indian custo-
> dian with the Indian child* and that these efforts have
> proved unsuccessful.

(Emphasis supplied.)

[10] The Nebraska statute is almost identical to the federal
statute, except it adds that "active efforts" must be made "to
unite the parent . . . with the Indian child."[32] Again, pursuant
to NICWA, "[p]arent means any biological parent or parents
of an Indian child or any Indian person who has lawfully
adopted an Indian child, including adoptions under tribal law
or custom."[33] As a result, "active efforts" must be made to
unite the Indian child with both biological parents, regard-
less of whether they are Indian. But the amended version of
§ 43-1505(4) also provides: "Prior to the court ordering . . . the
termination of parental rights, the court shall make a determi-
nation . . . *that the party seeking placement or termination has
demonstrated that attempts were made to provide active efforts
to the extent possible under the circumstances*." (Emphasis
supplied.) Therefore, the county court should review active
efforts in light of the particular circumstance presented in
this case.

Here, the county judge did not make any findings on the
issue of "active efforts." In fact, the court found that Daniel
and Linda were not required to show active efforts had been
made to unite Tyler and Micah. Therefore, on remand, the
court must reopen the record, and, in addition to applying
the correct standard to the issue of abandonment, determine
whether "active efforts" have been made or whether *attempts*

---

[32] See § 43-1505(4).

[33] § 43-1503(14).

*were made to provide active efforts to the extent possible under the circumstances.*[34]

### 5. Serious Emotional or Physical Damage

We now discuss the second additional element that ICWA and NICWA impose on parties seeking to terminate the parental rights of an Indian child, i.e., the "serious emotional or physical damage" element. The federal statute, 25 U.S.C. § 1912(f), provides:

> No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

Similarly, § 43-1505(6) provides:

> The court shall not order termination of parental rights under this section in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

In *Baby Girl*, the U.S. Supreme Court held that the "'serious emotional or physical damage'" element does not apply to parents who never had custody of the Indian child, reasoning that the words "'continued custody'" within the statute refer to custody that the parent already has (or at least had at some point in the past).[35] Because the Indian father in *Baby Girl* never had custody of the Indian child, the Supreme Court determined that the "'serious emotional or physical damage'"

---

[34] See § 43-1505(4).

[35] *Adoptive Couple v. Baby Girl, supra* note 26, 133 S. Ct. at 2560.

element did not apply to him.[36] In the present case, Daniel and Linda argue that because Tyler never had custody of Micah, Daniel and Linda need not prove the "serious emotional or physical damage" element.

On the other hand, Tyler argues that *Baby Girl* is limited to the particular facts of that case, which involved a father who did not have any contact with the child prior to the termination proceedings. Tyler argues that this case is distinguishable from *Baby Girl*, because he has visitation rights and "has paid his child support regularly, even while in custody at the State Penitentiary."[37] Indeed, Tyler does have visitation rights, but even assuming that the rule from *Baby Girl* is limited to the facts presented in that case, having the right of parenting time does little to distinguish this case from *Baby Girl* if the parent fails to exercise that right. Thus, we need to further examine Tyler's rights in the context of his actual parenting time.

The evidence supports that prior to his incarceration, Tyler did not have any contact with Micah for approximately 1 year. Since the birth of Micah in 2007, Tyler has lived with Micah for a mere 7 to 10 days. Tyler's visits with Micah were, by court order, to be supervised, and the record does not reflect that Tyler ever sought unsupervised or increased visitation. Further, Tyler never had custody, and there is no evidence that Tyler ever *sought* custody. Moreover, even if Tyler's rights are not terminated in this proceeding, Tyler will not be eligible to obtain custody of Micah until at least 2019, when he is eligible for parole and Micah is 12 years old. Micah should not be in limbo for years to come.[38]

Micah has two loving family members who have essentially raised him from birth, and there is no evidence that this situation is not in his best interests. The law provides procedural

---

[36] See *id*.

[37] Brief for appellee at 13.

[38] See *In re Interest of Levey*, 211 Neb. 66, 317 N.W.2d 760 (1982).

safeguards to protect parental rights to the utmost,[39] but the parent must, in return, make reasonable efforts to be a parent. Unfortunately, as the county judge noted, Tyler's record of fatherhood is minimal. Further, we agree with the county court that "it is the paternal grandmother, not the father, who pays the child support for the child."

After reviewing the evidence, we conclude that this case is not distinguishable from *Baby Girl*. Therefore, because Tyler never had custody of Micah, the "serious emotional or physical damage" element does not apply to him. Accordingly, on remand, the county court need not consider whether Daniel and Linda satisfied this element.

## VI. CONCLUSION

The county court erred in applying the "beyond a reasonable doubt" standard to the abandonment element and also in finding that Daniel and Linda were not required to show active efforts had been made to unite Tyler and Micah. We therefore reverse, and remand with directions to allow the parties to submit additional evidence in further proceedings consistent with this opinion.

REVERSED AND REMANDED.

---

[39] See *In re Interest of Ty M. & Devon M.*, 265 Neb. 150, 655 N.W.2d 672 (2003).