IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF TIEDYN M.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF TIEDYN M., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

TREKO M., APPELLANT.


Filed March 19, 2019.  No. A-18-808.


Appeal from the Separate Juvenile Court of Douglas County: ELIZABETH G. CRNKOVICH, Judge. Affirmed.

Michael Matthews for appellant.

Donald W. Kleine, Douglas County Attorney, Emily Peklo, and David Ceraso, Senior Certified Law Student, for appellee.


PIRTLE, ARTERBURN, and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Treko M. appeals the Douglas County Separate Juvenile Court order terminating his parental rights to his son, Tiedyn M. He contends that the court erred in finding that statutory bases under Neb. Rev. Stat. § 43-292(1), (2), (6), (7), and (9) (Reissue 2016) exist and that termination was in Tiedyn's best interests. For the foregoing reasons, we affirm.

- 1 -

## II. STATEMENT OF FACTS

### 1. BACKGROUND

Tiedyn was born in January 2015. Tiedyn was removed from his mother's care on August 28, 2016, due to allegations of lack of safe and stable housing and use of drugs and/or alcohol which created a risk of harm to Tiedyn. Since Tiedyn's removal from his mother's care, he has continuously been in out-of-home placement. Tiedyn has been diagnosed as developmentally delayed with speech, language, and expressive impairment.

Treko appeared at the mother's first appearance and protective custody hearing held on September 12, 2016. Counsel was appointed to represent Treko, who claimed to be Tiedyn's father. Tiedyn's mother relinquished her parental rights to Tiedyn in June 2018 and is mentioned only as is relevant for purposes of this appeal.

Treko filed a motion for genetic testing to determine Tiedyn's paternity which motion was granted by the court. On December 7, 2016, genetic testing results established that Treko is Tiedyn's biological father. On January 4, 2017, the State filed a supplemental petition alleging that Tiedyn was a child within the meaning of § 43-247(3)(a) (Reissue 2016) due to Treko's fault or habits in that Treko had failed to provide safe and stable housing, had failed to provide appropriate care, support, and supervision, and due to these allegations, Tiedyn was at risk of harm. That same day, the juvenile court issued an ex parte order providing that placement of Tiedyn was to exclude Treko's home.

In early February 2017, the juvenile court allowed the Choctaw Nation of Oklahoma to intervene in this case based on the Tribe's motion alleging that Tiedyn was a member of, or eligible for, membership in the Choctaw Nation. Thereafter, the State filed an amended supplemental petition adding allegations that Tiedyn was enrolled and/or was eligible for enrollment in the Choctaw Nation; that active efforts had been made to provide remedial services and rehabilitative programs designed to prevent the break-up of the family but said efforts had been unsuccessful; and that, continued custody of Tiedyn by Treko was likely to result in serious emotional or physical damage to Tiedyn. Following an adjudication hearing, on April 25, the court found that the allegations contained in the amended supplemental petition were true and found, by clear and convincing evidence, that Tiedyn was a child within the meaning of § 43-247(3)(a).

Following a dispositional hearing held in May 2017, the court ordered Treko to comply with a rehabilitation plan which required Treko to complete an individual diagnostic interview and follow any and all recommendations; complete a chemical dependency test and follow any and all recommendations; refrain from alcohol and nonprescription drugs; submit to random drug testing; participate in supervised visitation with Tiedyn; and provide proof of a legal source of income and housing. Following an October 2017 review hearing, the court added the additional requirements that Treko was to complete relinquishment counseling and maintain monthly contact with the family permanency specialist. Following a February 2018 review hearing, the juvenile court found that "no more reasonable efforts were required for Treko."

The following month, on March 28, 2018, the State moved to terminate Treko's parental rights alleging abandonment under § 43-292(1); substantial and continuous or repeated neglect under § 43-292(2); that active efforts had failed to reunite the family under § 43-292(6); that

Tiedyn had been in out of home placement for at least 15 of the last 22 months under § 43-292(7); and that Tiedyn was subjected to aggravated circumstances, specifically abandonment, under § 43-292(9). The motion also alleged that termination was in the best interests of Tiedyn, as well as other allegations necessary for termination under the Nebraska Indian Child Welfare Act (NICWA). The motion further alleged that reasonable efforts were not required because Treko had subjected Tiedyn "to aggravated circumstances including, but not limited to, abandonment, torture, chronic abuse, or sexual abuse."

## 2. TERMINATION HEARING

The termination hearing was held in July 2018. The State called witnesses including Alisha Lohman, the family permanency specialist; Cynthia Smith, Tiedyn's foster mother; and Shannon Suggs, a social worker with the Choctaw Nation. Treko testified on his own behalf.

### (a) State's Witnesses and Evidence

### (i) Alisha Lohman

Lohman testified that she took over the case as family permanency specialist on November 28, 2016. After genetic tests proved Treko was Tiedyn's biological father, Lohman attempted to contact Treko both directly and with the Choctaw Nation's assistance. Lohman attempted to contact Treko on December 12, 19, 27, and 30. She further received information that the Indian Child Welfare Act (ICWA) specialist for the Choctaw Nation had spoken with Treko and that Treko had stated he would contact Lohman by the end of the day on December 27, but he failed to do so.

After all of these attempts to contact Treko proved unsuccessful, on January 4, 2017, Lohman authored an affidavit setting forth that Tiedyn was "at risk for harm" in Treko's care and requested that a juvenile court petition be filed on Treko and that placement of Tiedyn exclude Treko's home. Lohman testified that when she finally contacted Treko in January 2017 and was able to schedule a home visit, about an hour later, Treko reported to her that the sheriff had served him with Lohman's January 4 affidavit. Lohman reported that Treko was upset, angry, and expressed that he felt like he could not trust Lohman.

In early January 2017, Lohman referred Treko for supervised visitation. Initially, Treko's visits were "going very well" and there were no safety concerns. The visits took place in the community; Treko provided food and diapers during the visits; Tiedyn was happy to see Treko; and Treko and Tiedyn "seemed to get along very well." Lohman testified that Treko's last visit with Tiedyn occurred on May 13, 2017. After that time, the company in charge of visitations was unable to contact Treko and discharged him due to lack of participation.

Lohman testified that she attempted to maintain monthly contact with Treko by sending multiple letters, sending text messages, leaving voicemail messages, sending a Facebook message, and contacting the Choctaw Nation and Treko's sister to ask if there was any other contact information available for him. She also testified that she made sure that Treko was not incarcerated by checking the Douglas County website. Lohman testified that she made at least one attempt per month to contact Treko, and there were months when she made more than one attempt to contact Treko. Lohman maintained monthly contact with the Choctaw Nation.

Lohman further testified that active efforts were provided to reunify Treko and Tiedyn including distributing the genetic test results quickly; offering services to Treko; providing services to Tiedyn including transportation and daycare; providing a cultural plan in which the foster family is actively trying to teach Tiedyn about his Native American heritage; placing Tiedyn in foster care with a sibling; and when Treko would not engage, she used the telephone, letters, and texts to try to reach him.

Lohman also testified that Treko did not complete the court-ordered initial diagnostic interview; did not complete the relinquishment counseling; did not complete the chemical dependency evaluation; did not obtain and maintain a legal source of income; did not demonstrate that he had obtained and maintained safe, stable, or appropriate housing; and did not maintain monthly contact with her.

Lohman testified that, in her opinion, Treko's parental rights should be terminated due to his: lack of communication with her; failure to attend Tiedyn's doctor's appointments, and/or speech and occupational therapy sessions; failure to make any decisions regarding Tiedyn's education; refusal to engage with the Early Development Network; failure to participate in supervised visits with Tiedyn for a period greater than 1 year; failure to participate in services; and failure to demonstrate the ability to meet Tiedyn's educational, physical, emotional, or medical needs. Additionally, even though he was provided the time and date, Treko failed to attend a surgery performed on Tiedyn in January 2017. Lohman opined that termination of Treko's parental rights was in Tiedyn's best interests.

### (ii) Cynthia Smith

Smith testified that she has been Tiedyn's foster mother since August 30, 2016, and he has resided with her continuously since that time. She testified that the last time that a visitation was scheduled was in April 2017, but the visit was canceled by Treko. Smith stated that Tiedyn has not asked about visits with Treko. Smith also testified that Treko has never called to speak with Tiedyn and has never sent gifts, money, or letters to Tiedyn. However, Treko did send 2 pairs of shoes and 5 to 7 outfits for Tiedyn between February and March 2017.

### (iii) Shannon Suggs

Suggs, a tribal social worker and member of the Choctaw Nation of Oklahoma, testified that she monitors ICWA cases in 42 states and had testified in approximately 200 ICWA cases. Suggs testified that she has significant contacts with the Tribe, has training or education on tribal customs relating to child rearing and family relationships, has experience providing social services to members of the tribal community, has knowledge of specific cultural traditions within the Tribe, is familiar with the social structure within the Tribe, has knowledge of the ceremonial and religious practices within the Tribe, has knowledge of the Tribe's traditions and beliefs with respect to health care and healing, and has received specialized training in child welfare practices as it relates to Native American families.

Suggs testified that she had her first contact with Treko before the genetic testing was performed where she informed him that the Tribe needed the genetic testing results because the Tribe could not enroll Tiedyn in the Tribe, or intervene in the case, unless Treko was on the birth

certificate or "had something stating he was the biological father." At the time of the termination hearing, Tiedyn was an enrolled member of the Choctaw Nation. Suggs testified that, since that initial contact, she had spoken to Treko less than 10 times.

Suggs testified that she received documentation from the case including genetic testing, the ICWA notice, court reports, an educational plan, a cultural plan, and a medical plan. Suggs testified that, based upon her review of these documents, Treko was not in compliance with the juvenile court's orders requiring drug testing, continued visitation, a home assessment, maintaining contact with the case worker, participation in relinquishment counseling, completion of an individual diagnostic interview and recommendations, and providing proof of income and housing. Suggs opined that, based upon her education, experience, training, knowledge, and expertise in ICWA, experience and knowledge of Native American issues, and review of the documentation in the current case, Treko did not comply with court orders and, without a home assessment, "we could not provide a recommendation of a safe placement for the child." She further testified that, Tiedyn would be at risk of serious emotional or physical damage if he remained placed with Treko. She further testified that she believed that the Nebraska Department of Health and Human Service (DHHS) had provided active efforts to Treko including giving him an opportunity to participate in services relating to Tiedyn's education and medical needs, participation in family team meetings, and other services all of which Treko failed to complete. Finally, Suggs opined that terminating Treko's parental rights was in Tiedyn's best interests.

### (iv) Drug Testing

Evidence established that a drug testing company unsuccessfully discharged Treko as a client because workers were unable to successfully contact Treko after making 10 attempts to obtain drug tests from him during the 1-month period from June 6 to July 6, 2017.

### (v) DHHS Court Reports

The May 15, 2017, September 22, 2017, and January 2, 2018, DHHS court reports were received into evidence. Together, the court reports set forth that reasonable efforts provided during the course of this case included agency foster care, supervised visits, speech therapy, daycare expenses, monthly visits and team meetings, and the offer of transportation to Tiedyn for services. The court reports also identified active efforts provided during the course of this case as genetic testing to establish paternity, providing the foster family with resources to assist in implementing a cultural plan, the highest level of placement preference for Tiedyn who was placed with a sibling, bimonthly phone calls and email contacts with the Choctaw Nation regarding Tiedyn and efforts to engage Treko, "Family Finding," and a homestudy involving a relative's home for possible placement.

The court reports further provided that Tiedyn's foster parents had been able to meet his physical, emotional, and educational needs. The reports provided that Tiedyn "does well" in his foster home by following directions and accepting redirection, gets along with the foster family, and the foster mother described Tiedyn as "her little buddy." The foster mother reads short stories to Tiedyn that are from the Choctaw Nation and works with him utilizing a coloring book provided by the tribe. The foster parents "use reasonable and prudent parenting standards by finding respite

for Tiedyn when they are out of town. They also take Tiedyn camping with them and have expressed plans to take Tiedyn to the zoo, children's museum and other activities over the summer."

Tiedyn was successfully discharged from his speech therapy but continues to receive services through the Early Development Network. The September 2017 court report noted:

> Tiedyn is growing fast and making huge developmental progress. . . . On September 18, 2017, Tiedyn's education team is getting together to update his [Individual Family Service Plan] and give him new goals to work on. Tiedyn thrives with structure. In the foster home, Tiedyn responds well to redirection when he isn't making the best choices. In daycare, Tiedyn enjoys learning and having a routine.

This court report also noted that the foster parents

> take the boys on camping trips as a family and go on outings. [The foster parents] strive to teach Tiedyn about his Native American background by taking Tiedyn to Native American exhibits at Mahoney State Park and [Fontanelle] Forest. They also read to Tiedyn from a book provided by the Choctaw Nation of Oklahoma and watch videos together.

Notably, regarding Treko, the May 2017 court report stated that Treko had refused to speak to Tiedyn's teachers and speech therapist to "get an idea of what Tiedyn's needs are." Treko stated "that Tiedyn does not have any needs other than his daddy."

(b) Treko's Testimony

Treko testified on his own behalf. Treko testified that he was present at Tiedyn's birth, but was not listed on the birth certificate. After about 6 months, he ended his relationship with Tiedyn's mother and she then prevented him from visiting Tiedyn. Treko testified that, in order to facilitate visitation with Tiedyn, he attempted to obtain genetic testing through the State, but Tiedyn's mother would not bring Tiedyn in to provide a DNA sample. Treko attended a court hearing in August 2016 and was appointed an attorney who requested a paternity test which established that Treko was Tiedyn's father.

According to Treko, he had supervised visitations with Tiedyn from January through May 2017 and his visitations were "great." Treko claimed that the visitation worker told him that Lohman ended Treko's visitations until he completed drug testing. Treko testified that he told Lohman that he was not going to take drug tests and, after that, he stopped having contact with Lohman and Suggs because they both stopped returning his calls. He admitted that after May 2017, he did not have any visits with Tiedyn. He admitted to using marijuana occasionally for his pain even though he knew it is illegal in Nebraska and claimed that his doctor knew about it and "told me I could do it if I don't get caught."

Treko stated that he set up an appointment for a walkthrough of his home, but it never occurred because an hour later a constable came to his house and served him with a petition "and said I was an endangerment to my child." Treko told Lohman that he felt betrayed. Treko contends that he has adequate housing but he has not made his home accessible for a home study because

he does not trust Lohman. He feels that she has "it out for [him]" because he receives disability payments. Treko testified that he wants Tiedyn to be placed with him.

### 3. JUVENILE COURT ORDER

After the hearing, the juvenile court issued an order terminating Treko's parental rights to Tiedyn based on § 43-292(1), (2), (6), (7), and (9), and providing that termination was in Tiedyn's best interests. The court also found that active efforts had been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the family, but that said efforts have proved unsuccessful; continuing custody of Tiedyn by Treko would likely result in serious emotional or physical damage to Tiedyn; and that termination of Treko's parental rights was in in Tiedyn's best interests.

## III. ASSIGNMENT OF ERROR

On appeal, Treko assigns as error that that the juvenile court erred in finding that his parental rights to Tiedyn should be terminated pursuant to § 43-292(1), (2), (6), (7), and (9) and that termination is in Tiedyn's best interests. However, in his brief, Treko only argues that the State failed to prove that termination was in Treko's best interests. His sole statement regarding the statutory basis for termination of parental rights is as follows: "Before parental rights may be terminated, the evidence must clearly and convincingly establish the existence of one or more of the statutory grounds permitting termination and that termination is in the juvenile's best interests. *In re Interest of Aaron D.*, 269 Neb. 249, 691 N.W.2d 164 (2005)." Brief for appellant at 8. This brief citation to caselaw which includes no argument in support thereof is insufficient to constitute discussion of the assigned error. See *State v. Reyes*, 18 Neb. App. 897, 794 N.W.2d 886 (2011). An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court. *State v. Sundquist*, 301 Neb. 1006, 921 N.W.2d 131 (2019).

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of K.M.*, 299 Neb. 636, 910 N.W.2d 82 (2018). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *Id*.

## V. ANALYSIS

### 1. PLAIN ERROR REVIEW

Although Treko has not properly preserved the issue of whether one of the statutory bases existed to terminate his parental rights, we will consider this issue for plain error. Plain error is error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process. *In re Interest of Mainor T. & Estela T.*, 267 Neb. 232, 674 N.W.2d 442 (2004); *In re Interest of Lizabella R.*, 25 Neb. App. 421, 907 N.W.2d 745 (2018). Plain error may be asserted for the first time on appeal or be noted

by an appellate court on its own motion. *In re Interest of Mainor T. & Estela T., supra; In re Interest of Lizabella R., supra.*

In order to terminate parental rights, a court must find by clear and convincing evidence that one of the statutory grounds enumerated in § 43-292 exists and that the termination is in the child's best interests. *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016). Under § 43-292(7), a juvenile court may terminate parental rights when the juvenile and "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months."

In August 2016, Tiedyn was removed from his mother's care and he has been in out-of-home placement since that time. Treko was immediately notified of this development and sought a paternity test which was completed in early December. Despite being informed of the test result and attempts by DHHS to schedule a walkthrough of his home to ensure that Treko had safe, suitable housing, Treko did not return telephone calls and canceled the walkthrough.

The State filed an adjudication petition regarding Treko in March 2017. From March 2017 until July 2018, Tiedyn was in out-of-home placement for nearly 17 months satisfying the requirement of § 43-292(7). Having found that there is clear and convincing evidence to show that Tiedyn had been in an out-of-home placement for 15 of the past 22 months under § 43-292(7), we need not discuss the other statutory grounds which the court found to exist. See *In re Interest of Jade H. et al.*, 25 Neb. App. 678, 911 N.W.2d 276 (2018) (only one statutory ground for termination need be proved in order for parental rights to be terminated).

In addition to proving the existence, by clear and convincing evidence, of one or more of the statutory grounds listed in § 43-292 and that termination is in the child's best interests, NICWA adds two additional elements the State must prove before terminating parental rights in cases involving Indian children. *In re Interest of Walter W.*, 274 Neb. 859, 744 N.W.2d 55 (2008). We likewise review these elements under the doctrine of plain error.

First, the State must prove by clear and convincing evidence that active efforts have been made to prevent the breakup of the Indian family and that these efforts have proved unsuccessful. See Neb Rev. Stat. § 43-1505(4) (Reissue 2016). See, also, *In re Interest of Walter W., supra*. We find no plain error as to this element as evidenced by the numerous services provided to Treko and Tiedyn over the pendency of this case and the numerous efforts made by the State to prevent the breakup of the Indian family which proved unsuccessful.

Second, the State normally must prove by evidence beyond a reasonable doubt, "including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." See § 43-1505(6). However, the "serious emotional or physical damage" element does not apply to a parent who has never had custody of an Indian child. *Adoptive Couple v. Baby Girl*, 570 U.S. 637, 133 S. Ct. 2552, 186 L. Ed. 2d 729 (2013); *In re Adoption of Micah H.*, 295 Neb. 213, 887 N.W.2d 859 (2016).

The evidence in this case establishes that Tiedyn has never lived with Treko, that Treko's prior relationship with Tiedyn was limited to court-ordered supervised visitation, that Treko never sought unsupervised or increased visitation, and failed to exercise that visitation for 11 months prior to the filing of the termination petition. After reviewing the evidence, we conclude Treko

never had custody of Tiedyn, and therefore the "serious emotional or physical damage" element has no application to the case at bar.

## 2. BEST INTERESTS

Treko next argues that the juvenile court erred in finding that termination of his parental rights was in Tiedyn's best interests.

In addition to proving a statutory ground for termination of parental rights, the State must show that termination is in the best interests of the child. *In re Interest of Kendra M. et al.*, 283 Neb. 1014, 814 N.W.2d 747 (2012); *In re Interest of Aly T. & Kazlynn T.*, 26 Neb. App. 612, 921 N.W.2d 856 (2018).

> A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must also show that the parent is unfit. There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. The term "unfitness" is not expressly used in § 43-292, but the concept is generally encompassed by the fault and neglect subsections of that statute, and also through a determination of the child's best interests. In discussing the constitutionally protected relationship between a parent and a child, the Nebraska Supreme Court has stated: "'"Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being."'" [*In re Interest of Kendra M.*, 283 Neb.] at 1033-34, 814 N.W.2d at 761. The best interests analysis and the parental fitness analysis are fact-intensive inquiries. And while both are separate inquiries, each examines essentially the same underlying facts as the other.

*In re Interest of Aly T. & Kazlynn T.*, 26 Neb. App. at 626, 921 N.W.2d at 867-68.

Here, ever since December 2016 when genetic testing proved that Treko was Tiedyn's father, Treko has failed to act in a manner consistent with a parent seeking to reunite with their child. Initially, he failed to return calls to the family permanency specialist and this lack of communication continued throughout the case. Treko began attending supervised visitations with Tiedyn in January 2017, but his final visit with Tiedyn occurred on May 1 of that year. Treko never requested additional visits and never requested that his visits progress beyond supervised. The visits stopped as a result of Treko's lack of participation. After May 1, he has failed to participate with Tiedyn for a period greater than 1 year.

Further, Treko failed to comply with the juvenile court's orders requiring drug testing, continued visitation, a home assessment, failing to participate in visitations, maintaining contact with the case worker, participation in relinquishment counseling, completion of an individual diagnostic interview and recommendations, and providing proof of income and housing. Treko failed to attend Tiedyn's doctor's appointments and speech and occupational therapy sessions; failed to make any decisions regarding Tiedyn's education; refused to engage with the Early Development Network; failed to participate in services; and failed to demonstrate the ability to

meet Tiedyn's educational, physical, emotional, or medical needs. He has never called to speak with Tiedyn during the entire time that Tiedyn has been in out-of-home placement. He has admitted to using marijuana. During the entire pendency of this case, Treko has been non-compliant and defiant and is no closer to putting himself in a position to reunifying with Tiedyn than when this case commenced in early January 2017.

In sum, Treko has not complied with the juvenile court's orders and his lack of involvement shows that he does not plan to comply. He has not demonstrated a willingness or desire to parent Tiedyn. Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Brooklyn T. & Charlotte T.*, 26 Neb. App. 669, 922 N.W.2d 240 (2018). Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *Id*. Based upon our de novo review of the record, we find clear and convincing evidence that Treko is unfit. We also find that it was shown by clear and convincing evidence that termination of Treko's parental rights would be in Tiedyn's best interests.

## VI. CONCLUSION

Having considered and rejected Treko's assigned errors, we affirm the juvenile court's order terminating his parental rights.

AFFIRMED.