Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
10/26/2018 09:12 AM CDT

In re Adoption of Micah H., a minor child.
Daniel H. and Linda H., appellees,
v. Tyler R., appellant.

___ N.W.2d ___

Filed October 26, 2018.    No. S-18-146.

1. **Jurisdiction: Juvenile Courts: Appeal and Error.** A jurisdictional issue that does not involve a factual dispute presents a question of law. An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings.

2. **Statutes: Appeal and Error.** To the extent an appeal calls for statutory interpretation or presents questions of law, an appellate court must reach an independent conclusion irrespective of the determination made by the court below.

3. **Adoption: Appeal and Error.** Appeals in adoption proceedings are reviewed by an appellate court for error appearing on the record.

4. **Judgments: Appeal and Error.** When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.

5. **Adoption.** The matter of adoption is statutory, and the manner of procedure and terms are all specifically prescribed and must be followed.

6. **Adoption: Parent and Child: Parental Rights.** Consent of a biological parent to the termination of his or her parental rights is the foundation of our adoption statutes, and an adoption without such consent must come clearly within the exceptions contained in the statutes.

7. **Adoption: Parent and Child.** A determination regarding parental consent, a finding under Neb. Rev. Stat. § 43-104(2) (Reissue 2016), or a determination regarding substitute consent does not end the court's inquiry as to whether the petition for adoption should be approved.

8. **Adoption.** Upon a hearing in an adoption proceeding, if the statutory requirements are otherwise satisfied, the court may decree an adoption after finding that such adoption is in the best interests of the child.

9. **Due Process: Parent and Child.** An established familial relationship is a liberty interest entitled to substantial due process protection.

10. **Constitutional Law: Parent and Child.** Concerning a parent-child relationship, the mere existence of a biological link does not merit equivalent constitutional protection.

11. \_\_\_\_: \_\_\_\_. The constitutional protection given to the familial relationship stems from the emotional attachments that derive from the intimacy of daily association.

12. **Constitutional Law: Parent and Child: Adoption: Notice.** When a biological father has not taken the opportunity to form a relationship with his child, the constitution does not afford him an absolute right to notice and an opportunity to be heard before the child may be adopted.

13. **Indian Child Welfare Act: Parental Rights.** The Nebraska Indian Child Welfare Act provides a higher standard of protection to the rights of the parent or Indian custodian of an Indian child than does the Indian Child Welfare Act; therefore, the Nebraska Indian Child Welfare Act controls.

14. \_\_\_\_: \_\_\_\_. Under the Nebraska Indian Child Welfare Act, there is no precise formula for active efforts; the active efforts standard requires a case-by-case analysis and should be judged by the individual circumstances.

15. \_\_\_\_: \_\_\_\_. Under the Nebraska Indian Child Welfare Act, active efforts are required even if the parent is incarcerated, but may include programs offered by the Department of Correctional Services.

16. \_\_\_\_: \_\_\_\_. Under the Nebraska Indian Child Welfare Act, a parent's demonstrated lack of willingness to participate in treatment may be considered in determining whether the state has taken active efforts.

17. **Adoption: Abandonment: Time.** Consent for an adoption is not required when a parent has abandoned the child for at least 6 months next preceding the filing of the adoption petition.

18. **Abandonment: Evidence: Proof.** In order for a court to find that abandonment has occurred, the petitioning party bears the burden of proving by clear and convincing evidence that the parent abandoned the child.

19. **Abandonment: Proof.** To constitute abandonment, it must appear that there has been, by the parents, a giving up or total desertion of the minor child. There must be shown an absolute relinquishment of the custody and control of the minor and thus the laying aside by the parents of all care for the minor.

20. **Abandonment: Words and Phrases.** Abandonment may be found where there is willful or intentional conduct on the part of the parent which evinces a settled purpose to forgo all parental duties and relinquish all parental claims to the child, or a willful neglect and

refusal to perform the natural and legal obligations of parental care and support.

21. **Abandonment: Evidence.** The conduct constituting abandonment must appear by clear and convincing evidence to be willful, intentional, or voluntary, without just cause or excuse.

22. **Adoption.** Adoption statutes will be construed strictly in favor of the rights of the natural parents in controversies involving termination of the relation of the parent and child.

23. **Abandonment: Evidence: Appeal and Error.** The various definitions of abandonment do not require an appellate court to view the statutory period defined in Neb. Rev. Stat. § 43-104(2)(b) (Reissue 2016) in a vacuum. One may consider the evidence of a parent's conduct, either before or after the statutory period, because this evidence is relevant to a determination of whether the purpose and intent of that parent was to abandon his or her child or children.

24. **Parental Rights: Abandonment.** In considering the issue of abandonment, parental incarceration may be considered as a basis for termination of parental rights.

25. ____: ____. Consideration of parental abandonment is not to say that criminal conduct or imprisonment alone necessarily justifies an order of permanent deprivation.

26. ____: ____. In a parental termination proceeding, a court may consider a parent's inability to perform his or her parental obligations because of imprisonment and the nature of the crime committed, which considerations are relevant to the issue of parental fitness and child welfare, as is the parent's conduct prior to and during the period of incarceration.

27. **Indian Child Welfare Act: Intent.** The policy behind the Indian Child Welfare Act was to further the nation's interest in protecting the best interests of Indian children and to promote the stability and security of Indian tribes and families by establishing minimum federal standards.

28. **Constitutional Law: Parental Rights.** It is a well-established maxim of constitutional law that the Due Process Clause of the 14th Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children.

29. **Adoption: Parental Rights: Abandonment: Final Orders.** Despite a finding of abandonment, a parent retains parental rights until the final judgment denying or granting the petition for adoption, and the parent may still participate in the proceedings to present evidence that adoption is not in the child's best interests.

30. **Adoption: Parental Rights.** If the court finds that adoption is not in the child's best interests, then the rights of the parent, who was deemed to have abandoned the child, are returned to the status quo.

31. **Adoption: Abandonment.** Abandonment, for purposes of adoption, is not always determined in proceedings separate from the underlying adoption, because nothing in the adoption statutes absolutely requires bifurcated proceedings.

Appeal from the County Court for Saunders County: PATRICK R. MCDERMOTT, Judge. Affirmed in part, and in part vacated and remanded with directions.

Jennifer D. Joakim for appellant.

Michael J. Novotny, of Fredericks, Peebles & Morgan, L.L.P., for appellees.

Evelyn N. Babcock and George T. Babcock, of Law Offices of Evelyn N. Babcock, for amici curiae Evelyn N. Babcock and George T. Babcock.

HEAVICAN, C.J., MILLER-LERMAN, CASSEL, STACY, FUNKE, PAPIK, and FREUDENBERG, JJ.

HEAVICAN, C.J.

## INTRODUCTION

This is an adoption case we first visited in *In re Adoption of Micah H.*,[1] where we concluded that the county court applied the wrong standard of proof in determining abandonment. We further concluded that the active efforts requirement of the Nebraska Indian Child Welfare Act (NICWA)[2] applied to cases involving the termination of parental rights over Indian children, even when the parent is not of Native American descent. We remanded the cause to the county court.

On remand, the county court, applying the correct standard of clear and convincing evidence, found that (1) the petitioning grandparents, Linda H. and Daniel H., had made active efforts to provide remedial and rehabilitative programs designed to "unite the parent . . . with the Indian child," under

---

[1] *In re Adoption of Micah H.*, 295 Neb. 213, 887 N.W.2d 859 (2016).

[2] Neb. Rev. Stat. §§ 43-1501 to 43-1517 (Reissue 2016).

§ 43-1505(4), and (2) Linda and Daniel presented clear and convincing evidence that Tyler R., the biological father, had abandoned Micah H., the child in question. Tyler appeals. This case presents issues regarding the interpretation of the relevant adoption statutes, as well as NICWA, and whether Tyler abandoned Micah. We affirm in part, vacate the adoption decree, and remand the cause to the county court with directions.

BACKGROUND

Micah is the 10-year-old biological child of Tyler and Allison H. Allison is a member of the Oglala Sioux Tribe. As such, Micah is an "Indian child" pursuant to the federal Indian Child Welfare Act of 1978 (ICWA)[3] and NICWA.

For the majority of Micah's life, he has resided with his legal guardians, Linda and Daniel, who are Allison's adoptive parents and do not share Allison's Native American heritage. Linda and Daniel sought to become Micah's guardians in March 2012, due to Allison's concerns regarding her ability to maintain sobriety. In April, the Saunders County Court appointed Linda and Daniel as Micah's guardians.

According to the record, Tyler also struggles with drug and alcohol addiction. He has been incarcerated since February 2012 for an alcohol-related motor vehicle homicide and has a projected release date of August 2019, at the earliest. Prior to his 2012 incarceration, Tyler had numerous encounters with the criminal justice system, many of those drug or alcohol related.

In January 2014, Micah was taken to see a psychologist for an evaluation. The psychologist's report concluded that "[g]iven obvious stressors (i.e.; [Allison's] and [Tyler's] substance abuse, [Tyler's] incarceration, alternate placement [with Linda and Daniel], and [grandparent] visitations [with Tyler's mother]) and Micah's symptoms of anxiety, including stuttering, nightmares, and general worry, a diagnosis of Adjustment Disorder with Anxiety appears appropriate."

---

[3] 25 U.S.C. §§ 1901 to 1963 (2012).

Linda and Daniel filed a petition for adoption and termination of parental rights in Saunders County Court. During the course of the adoption proceedings, Allison voluntarily relinquished all parental rights to, and custody of, Micah, asking that Micah be permitted to be adopted by Linda and Daniel. Tyler objected to Linda and Daniel's petitioned adoption. Linda and Daniel also served a copy of the complaint on the president of the Oglala Sioux Tribe, as required by § 43-1505(1), and the tribe declined to intervene.

In 2015, the Saunders County Court denied Linda and Daniel's petition. Linda and Daniel appealed, assigning as error that (1) the county court erred in finding that ICWA applied at the request of Tyler, a non-Indian, and (2) the county court erred in applying a higher burden of proof to the abandonment element under Neb. Rev. Stat. § 43-104(2) (Reissue 2016) by requiring that Linda and Daniel demonstrate abandonment "beyond a reasonable doubt."

On appeal, we determined that the county court erred in applying the "'beyond a reasonable doubt'" standard to the abandonment element and also in finding that Linda and Daniel were not required to show that active efforts had been made, under NICWA, to unite Tyler and Micah.[4] We noted that the appropriate standard concerning abandonment under § 43-104(2) is "clear and convincing evidence" of abandonment.[5] Further, we explained that under NICWA, Linda and Daniel were required to show active efforts to unite Tyler and Micah or that attempts to provide active efforts had been made to the extent possible under the circumstances. We remanded the cause to the county court for further proceedings.[6]

On remand, the county court found in favor of Linda and Daniel. Specifically, the county court concluded that Linda and

---

[4] *In re Adoption of Micah H., supra* note 1, 295 Neb. at 225, 887 N.W.2d at 868.

[5] *Id.*

[6] *Id.*

Daniel had demonstrated active efforts to unite Micah with Tyler by contacting the tribe in an attempt to establish services, as well as directing Tyler to the same treatment programs that they had used for Allison. The county court also found that Tyler had abandoned Micah.

Although the county court found there was evidence that Tyler had engaged in some treatment programs, it noted that Tyler continued to use drugs and alcohol, leading to his conviction for motor vehicle homicide. The county court also found there was no evidence that Tyler even attempted to acquaint himself with the history, cultural norms, and practices of the tribe, or any customs that have bearing on the parent-child relationship.

Linda and Daniel testified that as far as they were aware, prior to his incarceration, Tyler maintained a residence in his mother's basement and had the means to acquire transportation. Prior to 2011, Linda and Daniel assisted in providing for visitation as well as instruction regarding the appropriate interactions with and care for a toddler. Linda indicated that she had conversations with Tyler concerning scheduling visits and obtaining help with drug and alcohol addiction, and even assisted with the parenting plan provided by the court.

Daniel noted that after Micah began demonstrating inappropriate behaviors, Allison retained the services of an attorney in order to send Tyler a letter expressing her concern and requesting assurances with regard to the monitoring of Tyler's visitation with Micah. The letter was dated May 16, 2011. Daniel indicated that after Tyler's receipt of the letter, he discontinued his visitations with Micah. Daniel further indicated that he had supported Tyler's visitations with Micah until Micah began exhibiting concerning behaviors.

Tyler indicated that since his incarceration, he had obtained a certificate from every level of the "Designated Dad Program." The record indicates that Tyler attended one Alcoholics Anonymous meeting for the stated purposes of "[s]upport[ing] others there." However, Tyler testified that

Linda and Daniel never spoke with him about rehabilitation services and that he did not believe that he required any alcohol rehabilitation services. This was despite the fact that Tyler had a lengthy criminal history involving alcohol and drug possession.

Tyler admitted that he had not had any face-to-face contact with Micah since about 2011, or for over a year prior to his incarceration. Despite Tyler's incarceration, he has continued to send letters to Micah. Tyler has attempted to utilize money he earned during his incarceration to pay the child support he owes. However, due to the minimal earnings, the State rejected Tyler's request to direct funds to the Department of Health and Human Services. The record demonstrates that Tyler's mother pays the child support and that Tyler assists when he is able. Despite claims that Linda and Daniel have prevented Micah from visiting Tyler, the court below noted that no formal request had been made by Tyler to have Micah visit him in prison.

During the course of the adoption proceedings, and while discussing preliminary matters, the court observed that it was aware that "these kinds of cases" have two procedural stages. But the court indicated that the guardian ad litem had been informed that he may be called to testify at the completion of the proceedings regarding abandonment and Micah's best interests, rather than the usual procedure of holding a hearing on the matter at a later date. In fact, the guardian ad litem did testify and was cross-examined regarding Micah's best interests at that same hearing.

At the conclusion of the trial, the county court judge noted that he was "not turning this case over to some other judge to read the record and come to a conclusion. I am the one that's heard all the live evidence." The judge further stated that "[i]t would be unfair to a colleague and really unfair to all of the litigants because . . . those observations are important in the context of *the whole case*." (Emphasis supplied.) The county court then found that Tyler had abandoned Micah and terminated

Tyler's parental rights, further finding that adoption by Linda and Daniel was in Micah's best interests. Accordingly, a decree granting the adoption was entered.

Tyler appeals.

## ASSIGNMENTS OF ERROR

Tyler assigns that the trial court erred in (1) finding that Linda and Daniel had used active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of an Indian family or to unite the parent or Indian custodian with the Indian child within the meaning of NICWA, (2) finding by clear and convincing evidence that Tyler abandoned Micah under § 43-104(2), (3) finding that the adoption was in the best interests of the child, (4) granting the decree without notice and an opportunity to be heard at a further hearing on the best interests of Micah after terminating Tyler's parental rights, and (5) not adhering to statutory adoption requirements.

## STANDARD OF REVIEW

[1-4] A jurisdictional issue that does not involve a factual dispute presents a question of law.[7] An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings.[8] To the extent an appeal calls for statutory interpretation or presents questions of law, an appellate court must reach an independent conclusion irrespective of the determination made by the court below.[9] Appeals in adoption proceedings are reviewed by an appellate court for error appearing on the record.[10] When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to

[7] *In re Adoption of Madysen S. et al.*, 293 Neb. 646, 879 N.W.2d 34 (2016).

[8] *In re Interest of Jorge O.*, 280 Neb. 411, 786 N.W.2d 343 (2010).

[9] *Id.*

[10] *Jeremiah J. v. Dakota D.*, 287 Neb. 617, 843 N.W.2d 820 (2014).

the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.[11]

## ANALYSIS

*Relevant Legal Principles.*

[5,6] In Nebraska, the matter of adoption is statutory, and the manner of procedure and terms are all specifically prescribed and must be followed.[12] Consent of a biological parent to the termination of his or her parental rights is the foundation of our adoption statutes, and an adoption without such consent must come clearly within the exceptions contained in the statutes.[13] As relevant to this case, § 43-104(2) provides that "[c]onsent shall not be required of any parent who . . . has abandoned the child for at least six months next preceding the filing of the adoption petition . . . ."

[7,8] A determination regarding parental consent, a finding under § 43-104(2), or a determination regarding substitute consent does not end the court's inquiry as to whether the petition for adoption should be approved.[14] Upon a hearing, if the statutory requirements are otherwise satisfied, the court may decree an adoption after finding that such adoption is in the best interests of the child.[15]

[9-12] The U.S. Supreme Court has long recognized that state intervention in a parent-child relationship is subject to constitutional oversight.[16] The Court has held that an established familial relationship is a liberty interest entitled to substantial due process protection, but made clear that "the mere existence of a biological link does not merit equivalent

---

[11] *Id.*

[12] *In re Adoption of Madysen S. et al., supra* note 7.

[13] *Id.*

[14] *Id.*

[15] *Id.* (citing Neb. Rev. Stat. § 43-109(1) (Reissue 2016)).

[16] See *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S. Ct. 571, 69 L. Ed. 1070 (1925). See, also, *Meyer v. Nebraska*, 262 U.S. 390, 43 S. Ct. 625, 67 L. Ed. 1042 (1923).

constitutional protection."[17] The Court explained that the constitutional protection given to the familial relationship stems from the emotional attachments that derive from the intimacy of daily association.[18] Thus, when a biological father has not taken the opportunity to form a relationship with his child, the constitution does not afford him an absolute right to notice and opportunity to be heard before the child may be adopted.[19] However, adoption cases become even more complex when the adoption involves a child of Native American descent.

In cases involving Indian children under ICWA or under NICWA, certain additional safeguards provide heightened protection to the rights of parents and tribes in proceedings involving custody, termination of parental rights, and adoption of Indian children.[20] These additional safeguards are provided to protect "the essential tribal relations and best interests of an Indian child by promoting practices consistent with [ICWA]."[21]

The purpose behind ICWA is

> to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs.[22]

---

[17] *Lehr v. Robertson*, 463 U.S. 248, 261, 103 S. Ct. 2985, 77 L. Ed. 2d 614 (1983).

[18] *Id.*

[19] See *In re Adoption of Baby Girl H.*, 262 Neb.775, 635 N.W.2d 256 (2001), *disapproved on other grounds, Carlos H. v. Lindsay M.*, 283 Neb. 1004, 815 N.W.2d 168 (2012).

[20] *In re Adoption of Kenten H.*, 272 Neb. 846, 725 N.W.2d 548 (2007).

[21] See § 43-1502.

[22] 25 U.S.C. § 1902.

NICWA was enacted by the Nebraska Legislature in 1985 "to clarify state policies and procedures regarding the implementation by the State of Nebraska of [ICWA]."[23]

As this court has previously noted, the applicability of ICWA and NICWA to an adoption proceeding turns not on the Indian status of the person who invoked the acts, but on whether an "Indian child" is involved.[24] As we have previously noted, there is no dispute that Micah is an "Indian child" under NICWA.[25] But, as stated in *In re Adoption of Micah H.*, this does not mean that every provision of ICWA and NICWA applies to a non-Indian parent.[26] And U.S. Supreme Court precedent has limited the applicability of ICWA to certain cases based on specific facts as discussed below.[27]

As noted, ICWA and NICWA set forth an "active efforts" element. The federal statute provides in part:

> Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.[28]

This statute was interpreted by the U.S. Supreme Court in *Adoptive Couple v. Baby Girl*.[29] In *Baby Girl*, the adoptive parents of a young Indian girl petitioned the U.S. Supreme Court for certiorari after the South Carolina Supreme Court

---

[23] § 43-1502.

[24] See §§ 43-1504 and 43-1505. See, also, *In re Adoption of Kenten H., supra* note 20.

[25] See *In re Adoption of Micah H., supra* note 1.

[26] *Id.*

[27] *Adoptive Couple v. Baby Girl*, 570 U.S. 637, 133 S. Ct. 2552, 186 L. Ed. 2d 729 (2013).

[28] 25 U.S.C. § 1912(d).

[29] *Adoptive Couple v. Baby Girl, supra* note 27.

interpreted provisions of ICWA to require that the child be removed from her adoptive parents' care and placed with her biological father. The child's biological father, a member of the Cherokee Nation, had previously attempted to relinquish custody of the child that had never met him. The U.S. Supreme Court reversed, interpreting the "active efforts" provision of ICWA to apply "only in cases where an Indian family's 'breakup' would be precipitated by the termination of the parent's rights."[30] Because the Indian father in *Baby Girl* never had custody of the Indian child, the court concluded that the "active efforts" element did not apply to the termination of the Indian father's parental rights.[31]

[13] NICWA provides a higher standard of protection to the rights of the parent or Indian custodian of an Indian child than does ICWA; therefore, NICWA controls.[32]

NICWA provides in part:

Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under state law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family or unite *the parent* or Indian custodian with the Indian child and these efforts have proved unsuccessful.[33]

The Nebraska statute is almost identical to the federal statute, except it adds that "active efforts" must be made to "unite the parent . . . with the Indian child."[34] Pursuant to NICWA, "[p]arent means any biological parent or parents of an Indian child or any Indian person who has lawfully adopted an Indian

---

[30] *Id.*, 570 U.S. at 651.

[31] *Id.*

[32] See § 43-1513 and 25 U.S.C. § 1921.

[33] § 43-1505(4) (as amended by 2015 Neb. Laws, L.B. 566) (emphasis supplied).

[34] See § 43-1505(4) and 25 U.S.C. § 1912(d).

child, including adoptions under tribal law or custom."[35] As a result, we determined that "active efforts" must be made to unite an Indian child with both biological parents, regardless of whether they are of Native American descent.[36] As such, in this case, the county court was directed to determine whether *attempts were made to provide active efforts to the extent possible under the circumstances*.[37] We review that determination de novo.

*Active Efforts.*

In his first assignment of error, Tyler argues that the evidence adduced at trial failed to establish by clear and convincing evidence that Linda and Daniel had used "active efforts" to unite Tyler and Micah. We disagree.

The crux of Tyler's contention is his assertion, made without authority, that § 43-1503(1)(a) to (h) is a checklist, with a requirement that Linda and Daniel comply with each subsection. This is a question of statutory interpretation, which this court reviews de novo.

[14] There is no precise formula for active efforts; the active efforts standard requires a case-by-case analysis[38] and should be judged by the individual circumstances.[39] We have observed that efforts made under § 43-1503 should generally be "'culturally relevant.'"[40]

In *In re Interest of Walter W.*,[41] we found that the State demonstrated by clear and convincing evidence that it had

---

[35] See § 43-1503(14).

[36] *In re Adoption of Micah H., supra* note 1.

[37] See § 43-1505(4).

[38] See *In re Interest of Walter W.*, 274 Neb. 859, 744 N.W.2d 55 (2014). See, also, § 43-1505(4); Judiciary Committee Hearing, L.B. 566, 104th Leg., 1st Sess. 4 (Feb. 26, 2015).

[39] See *In re Adoption of Micah H., supra* note 1. See, also, § 43-1503(1)(a).

[40] See *In re Interest of Walter W., supra* note 38, 274 Neb. at 865, 744 N.W.2d at 61.

[41] See *In re Interest of Walter W., supra* note 38.

made active efforts to provide remedial services and rehabilitative programs to prevent the breakup of the Indian family. In that case, we noted that the State's efforts consisted of providing transportation, foster care and medical care for the child, vouchers for rent, clothing, bills, and drug testing. Additionally, the case manager provided the mother with information regarding both inpatient and outpatient chemical dependency programs and encouraged her to apply. Further, the case manager followed up on the mother's progress—or lack thereof, as was the case.

[15,16] In *Philip J. v. State*,[42] the Alaska Supreme Court noted that active efforts are required even if the parent is incarcerated, but may include programs offered by the Alaska Department of Corrections. However, the court stated that "'a parent's demonstrated lack of willingness to participate in treatment may be considered in determining whether the state has taken active efforts'" and noted that the court had excused "'further active efforts once the parent expresses an unwillingness to participate.'"[43]

In this case, Tyler was counseled by Linda concerning his drug and alcohol problems. The record shows that Linda suggested multiple treatment programs in which Tyler could seek rehabilitation for his addiction. However, Linda and Daniel had no control with regard to forcing Tyler to seek treatment.

The record demonstrates that Linda and Daniel discussed proper parenting techniques and interactions with small children. Further, Linda and Daniel assisted with scheduling visitation and the implementation of a parenting plan. Tyler demonstrated no need for housing, financial support, or transportation to unite with Micah. Despite Tyler's numerous criminal convictions involving drugs and alcohol, Tyler maintained that he does not suffer from drug or alcohol addiction.

With the exception of completing parenting classes while in prison, Tyler has not sought to actively participate in drug

---

[42] *Philip J. v. State*, 314 P.3d 518 (Alaska 2013). See 25 U.S.C. § 1912(d).

[43] *Philip J. v. State, supra* note 42, 314 P.3d at 528.

and alcohol treatment or support programs. In fact, Tyler has attended only one Alcoholics Anonymous meeting while in prison, at the invitation of another, and suggested to the court below that his presence at the meeting was for the purpose of supporting others in the program.

Based on the specific facts and circumstances of this case, we find that Linda and Daniel undertook active efforts to provide remedial services and rehabilitative programs designed to unite Tyler and Micah.

*Abandonment.*

In his second assignment of error, Tyler argues that there was not clear and convincing evidence that he had abandoned Micah.

[17] Generally, for a court to grant an adoption petition, § 43-104(1) requires that the biological parents of the child must execute written consent to the adoption. However, under § 43-104(2)(b), consent is not required when a parent has "abandoned the child for at least six months next preceding the filing of the adoption petition."

[18-20] In order for a court to find that abandonment has occurred, the petitioning party bears the burden of proving by clear and convincing evidence that the parent abandoned the child.[44] In *In re Adoption of Simonton*,[45] this court defined the word "abandoned" when used in the context of adoption proceedings. To constitute abandonment, it must appear that there has been, by the parents, a giving up or total desertion of the minor child.[46] In other words, there must be shown an absolute relinquishment of the custody and control of the minor and thus the laying aside by the parents of all care for the minor.[47]

---

[44] See *In re Application of S.R.S. and M.B.S.*, 225 Neb. 759, 408 N.W.2d 272 (1987).

[45] *In re Adoption of Simonton*, 211 Neb. 777, 320 N.W.2d 449 (1982).

[46] *Id.*

[47] *In re Application of S.R.S. and M.B.S., supra* note 44 (quoting *In re Adoption of Christofferson*, 89 S.D. 287, 232 N.W.2d 832 (1975)).

We have further noted that abandonment may be found where there is willful or intentional conduct on the part of the parent which evinces a settled purpose to forgo all parental duties and relinquish all parental claims to the child, or a willful neglect and refusal to perform the natural and legal obligations of parental care and support.[48]

[21,22] The conduct constituting abandonment as defined above must appear by clear and convincing evidence to be willful, intentional, or voluntary, without just cause or excuse.[49] As a general rule, adoption statutes will be construed strictly in favor of the rights of the natural parents in controversies involving termination of the relation of the parent and child. This is especially true in those cases where it is claimed that owing to the willful abandonment of the child, the consent of the parent to the adoption is not required.[50]

[23] Pursuant to § 43-104(2)(b), the critical period of time during which abandonment must be shown is the 6 months immediately preceding the filing of the adoption petition. However, various definitions of abandonment do not require us to view this statutory period in a vacuum. One may consider the evidence of a parent's conduct, either before or after the statutory period, because this evidence is relevant to a determination of whether the purpose and intent of that parent was to abandon his or her child or children.[51]

[24-26] In considering the issue of abandonment, we have held that parental incarceration may be considered as a basis for termination of parental rights under Neb. Rev. Stat. § 43-292(1) (Reissue 2016).[52] Further, nothing in Nebraska law prevents us from applying this consideration in cases under § 43-1501. Of course, this is not to say that criminal

---

[48] *Id*. (quoting *In re Cardo*, 41 N.C. App. 503, 255 S.E.2d 440 (1979)).

[49] *In re Application of S.R.S. and M.B.S., supra* note 44.

[50] *In re Adoption of Simonton, supra* note 45.

[51] *Id.*

[52] See *In re Interest of L.V*., 240 Neb. 404, 482 N.W.2d 250 (1992).

conduct or imprisonment alone necessarily justifies an order of permanent deprivation.[53] But we can, in a parental termination proceeding, consider ""a parent's inability to perform his parental obligations because of imprisonment [and] the nature of the crime committed[, which considerations] are . . . relevant to the issue of parental fitness and child welfare, as [is] the parent's conduct prior to . . . and during the period of incarceration." . . .'"[54] Additionally, we have often stated that although incarceration itself may be involuntary, the criminal conduct causing the incarceration is voluntary.[55]

In *In Interest of L.V.*,[56] the father spent much of his child's life bouncing in and out of the prison system. We held that although the father sent his child cards, letters, gifts, small amounts of money, a framed photograph, and a painting he had made while in prison, that was not sufficient to overcome the conclusion that he had abandoned his child.

In *In re Interest of M.L.B.*,[57] we upheld the termination of a mother's parental rights based on her years of incarceration, lack of monetary support, lack of gainful employment when not incarcerated, and overall lack of cooperation with services intended to assist her in maintaining custody of her child. The termination was upheld even though the mother demonstrated an interest by sending gifts to the child.

In this case, the evidence demonstrates that since the birth of Micah in 2007, Tyler has lived with Micah for a mere 7

---

[53] See *id*. See, also, *In re Interest of Kalie W.*, 258 Neb. 46, 601 N.W.2d 753 (1999).

[54] *In re Interest of L.V., supra* note 52, 240 Neb. at 420, 482 N.W.2d at 260-61. See, also, *In Interest of M.L.K.*, 804 S.W.2d 398 (Mo. App. 1991); *In re Juvenile Appeal (84-6)*, 2 Conn. App. 705, 483 A.2d 1101 (1984); *In re Pawling*, 101 Wash. 2d 392, 679 P.2d 916 (1984); *Matter of Adoption of Doe*, 99 N.M. 278, 657 P.2d 134 (N.M. App. 1982); *In re Brannon*, 340 So. 2d 654 (La. App. 1976); *In re Welfare of Staat*, 287 Minn. 501, 178 N.W.2d 709 (1970).

[55] See *In re Interest of Kalie W., supra* note 53.

[56] *In re Interest of L.V., supra* note 52.

[57] *In re Interest of M.L.B.*, 221 Neb. 396, 337 N.W.2d 521 (1985).

to 10 days. While Tyler did sometimes have visitation with Micah, those visits were by court order and were supervised. There is no indication from the record that Tyler ever sought unsupervised or increased visitation. Moreover, Tyler never had custody of Micah and there is no evidence that Tyler ever sought custody. Finally, the record demonstrates that the last face-to-face contact between Tyler and Micah was May 8, 2011. Tyler never requested that Micah visit the prison where he has resided since 2012, and will remain until 2019 at which time he will be eligible for parole.

As stated above, the court can look beyond the 6 months immediately preceding Linda and Daniel's filing in order to determine whether Tyler had abandoned Micah. In considering Tyler's actions prior to his incarceration, it is clear that he had ceased visiting Micah in May 2011. Tyler has never paid child support and instead relied on the generosity of his mother in order to meet his obligations. In addition, Tyler began corresponding with Micah only upon Tyler's incarceration. Tyler refuses to acknowledge or seek treatment for his substance abuse problems, despite the fact that treatment is available to him in prison.

The trial court concluded that "[w]hen [Tyler] was at liberty he . . . never sought to enforce any visitation with [Micah]. During that period he deliberately withheld from [Micah] normal parental care . . . associated with [a] normal parent-child relationship."

We observe the evidence at trial indicated that Tyler had sent letters, drawings, and puzzles to Micah, thus making some attempt to maintain contact with him. However, as this court has noted, where there has been a protracted period of totally unjustified failure to exercise parental functions, an isolated contact or expression of interest does not necessarily negate the inference that a person no longer wishes to act in the role of parent to a child.[58]

---

[58] *In re Adoption of Simonton, supra* note 45. See, also, *Matter of Thomas F. L.*, 87 Misc. 2d 744, 386 N.Y.S.2d 726 (1976).

These facts, coupled with the fact that Tyler will remain incarcerated for the next 1 to 3 years, gives significant weight to a finding of abandonment under our precedent.[59] As we have stated, "'"[W]e will not gamble with [a] child's future; [a child] cannot be made to await uncertain parental maturity."'"[60]

There is no merit to Tyler's second assignment of error.

*Micah's Best Interests.*

In his third assignment of error, Tyler contends that the court erred in finding that adoption by Linda and Daniel was in Micah's best interests.

[27] The policy behind ICWA was to further the nation's interest in protecting the best interests of Indian children and to promote the stability and security of Indian tribes and families by establishing minimum federal standards.[61] In determining the best interests of the child, NICWA at § 43-1503 states:

(2) Best interests of the Indian child shall include:

(a) Using practices in compliance with [ICWA], [NICWA], and other applicable laws that are designed to prevent the Indian child's voluntary or involuntary out-of-home placement; and

(b) Whenever an out-of-home placement is necessary, placing the child, to the greatest extent possible, in a foster home, adoptive placement, or other type of custodial placement that reflects the unique values of the Indian child's tribal culture and is best able to assist the child in establishing, developing, and maintaining a political, cultural, and social relationship with the Indian child's tribe or tribes and tribal community.

---

[59] See, generally, *In Interest of L.V., supra* note 52.

[60] See *In re Interest of M.L.B., supra* note 57, 221 Neb. at 397, 337 N.W.2d at 522.

[61] See 25 U.S.C. § 1902.

Here, in complying with NICWA, Linda and Daniel served the Oglala Sioux Tribe with notice of their petition. The tribe subsequently declined to intervene in the matter.

As noted in the record, Tyler is a non-Indian. The only evidence of Tyler's efforts to promote Micah's Native American heritage is his own testimony that he has taken Micah to tribal events. Conversely, Linda and Daniel raised Allison, a member of the Oglala Sioux Tribe, since the age of 4. Linda and Daniel raised Allison to know of her Native American heritage, to be familiar with Native American artifacts, and to read about Native American culture using books that are kept in their home.

The record demonstrates that Linda and Daniel have made efforts to expose Micah to his Native American heritage through reading books, attending tribal events, and keeping Native American artifacts in the home. Additionally, Allison, a member of the Oglala Sioux Tribe, continues to interact with Micah at Linda and Daniel's home.

It appears clear from the record that Linda and Daniel took measures to facilitate and encourage appropriate interactions between Tyler and Micah. Linda and Daniel used active efforts to provide and promote appropriate visitation by assisting in the implementation of a parenting plan. Upon noticing certain anxious and inappropriate behaviors displayed by Micah, Linda and Daniel, along with Allison, sought professional assistance in addition to clarification of the parenting plan and visitation to ensure a safe environment.

Micah has lived with Linda and Daniel for the majority of his life, and they have been his only source of stability. The guardian ad litem independently testified that in his opinion, based upon his own independent investigation, the adoption of Micah by Linda and Daniel was in Micah's best interests.

Based on the foregoing, we agree that adoption by Linda and Daniel is in Micah's best interests. We accordingly find Tyler's third assignment of error to be without merit.

*Tyler's Due Process Rights.*

In his fourth assignment of error, Tyler argues that the trial court failed to allow him to participate in the adoption proceeding, specifically concerning the determination of the best interests of Micah. Tyler bases his argument on the proposition that despite a finding of abandonment, a parent retains parental rights until the final judgment concerning the petition for adoption.

[28] It is a well-established maxim of constitutional law that "the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children."[62]

[29-31] Tyler properly contends that in *In re Adoption of Madysen S. et al.*,[63] we held that parental rights are not terminated by an order deciding the limited issue of abandonment. Despite a finding of abandonment, the parent retains parental rights until the final judgment denying or granting the petition for adoption, and the parent may still participate in the proceedings to present evidence that adoption is not in the child's best interests.[64] Ultimately, if the county court finds that adoption is not in the child's best interests, then the rights of the parent, who was deemed to have abandoned the child, are returned to the status quo.[65] However, we have also stated that abandonment, for purposes of adoption, is not always determined in proceedings separate from the underlying adoption, because nothing in the adoption statutes absolutely requires bifurcated proceedings.[66]

Here, Tyler challenges that his understanding was that the hearing was bifurcated. Tyler fails to provide any evidence in

---

[62] See *Troxel v. Granville*, 530 U.S. 57, 66, 120 S. Ct. 2054, 147 L. Ed.2d 49 (2000).

[63] *In re Adoption of Madysen S. et al., supra* note 7.

[64] *Id.*

[65] *Id.*

[66] *Id.*

the record that bifurcation was requested or ordered. In discussing preliminary matters, the court stated that it was aware that "these kinds of cases" have two procedural stages, and then indicated that the guardian ad litem had been warned that he may be called when the court reached the end of the case "for his comments on the adoption portion of it." Further, at the conclusion of the trial, the lower court judge was quite clear in stating, "I am not turning this case over to some other judge to read the record and come to a conclusion. I am the one that's heard all the live evidence." The judge further stated that "[i]t would be unfair to a colleague and really unfair to all of the litigants because . . . those observations are important in the context of *the whole case*." (Emphasis supplied.) Counsel made no objection at this point, despite being given the opportunity to do so.

Notwithstanding this apparent claim of unfair surprise, Tyler was not prejudiced, because he was given a full and fair opportunity to call witnesses at the hearing and was able to cross-examine witnesses, specifically the guardian ad litem. While Tyler now argues that he was not aware that the hearing was not bifurcated, that fact was stated at the hearing and Tyler did not object, otherwise seek to offer additional evidence, or ask for a continuance.

We therefore find Tyler's fourth assignment of error to be without merit.

*Noncompliance With Statutory Requirements.*

Tyler's final assignment of error is that the trial court erred in not strictly adhering to the requirements of Neb. Rev. Stat. §§ 43-107 to 43-109 (Reissue 2016).

Section 43-107(b)(i) provides that "[f]or adoption placements occurring on or after January 1, 1994, a preplacement adoptive home study shall be filed with the court prior to the hearing [on the petition for adoption]." Additionally, anyone seeking to adopt a child in the State of Nebraska must submit to a criminal history check conducted by the Nebraska

State Patrol. And § 43-108 holds that "[t]he minor child to be adopted, unless such child is over fourteen years of age, and the person or persons desiring to adopt the child *must* appear in person before the judge at the time of hearing . . . ." (Emphasis supplied.)

Finally, § 43-109(1) states in relevant part that the child must reside with the petitioners for at least 6 months preceding the adoption hearing. The statute further provides that "[n]o decree of adoption shall be entered unless . . . (b) the medical histories required by subsection (2) of section 43-107 have been made a part of the court record, [and] (c) the court record includes an affidavit or affidavits signed by the relinquishing biological parent . . . ."[67]

We turn first to § 43-107. Linda and Daniel argue that the trial court waived the home study pursuant to their discretion under § 43-107(b)(ii), noting that Micah has resided with them for the majority of his life and, further, that Linda and Daniel are his current legal guardians. This argument misinterprets the plain meaning of § 43-107(b)(ii), which states:

> An adoptive home study shall not be required when the petitioner is a stepparent of the adoptee unless required by the court. An adoptive home study may be waived by the court upon a showing of good cause by the petitioner when the petitioner is a *biological grandparent* or a step-grandparent who is married to the biological grandparent at the time of the adoption if both are adopting the child.

(Emphasis supplied.)

The Legislature, in enacting § 43-107(b)(ii), limited the courts' discretion to a clearly defined list of petitioners which includes biological grandparents, but is silent as to adoptive grandparents. We note that the Legislature defined "grandparent" in Neb. Rev. Stat. § 43-1801 (Reissue 2016) to include both biological and adoptive grandparents, but limited its

---

[67] See § 43-109(1).

definition of grandparent to § 43-1801 and Neb. Rev. Stat. §§ 43-1802 and 43-1803 (Reissue 2016). Therefore, we must conclude that the Legislature intentionally excluded adoptive grandparents from the waiver permitted under § 43-107(b)(ii).

Linda and Daniel contend that the trial court relied on the criminal history check done when Linda and Daniel became Micah's legal guardians in 2012 and that in so relying, Linda and Daniel had complied with § 43-107. The record indicates that during the guardianship proceedings, the criminal history check was waived pursuant to Neb. Rev. Stat. § 30-2602.02 (Reissue 2016), but does not provide any information concerning the required criminal history check.

We next address § 43-108, which requires Micah's presence at the time of the adoption hearing. Micah was present during some of the proceedings below; however, it does not appear from the record that Micah was present at the adoption hearing.

Finally, Linda and Daniel counter that the information required under § 43-109 was met by the fact that Micah has resided with them for more than 6 months preceding the adoption petition and that the medical records were provided in the May 12, 2015, adoption proceeding. But the medical records do not appear to be included in the record as argued by Linda and Daniel.

As to § 43-109(c), a document relinquishing her parental rights was signed by Allison and the county court judge on June 3, 2015. The document appears in the record and operates as a valid and effective relinquishment of all parental rights.

Based on the above discussion, we find that Tyler's fifth assignment of error has merit, as the county court failed to strictly comply with the statutory requirements.

## CONCLUSION

The county court did not err in finding by clear and convincing evidence that Linda and Daniel made active efforts to reunite Micah with Tyler, in finding that Tyler abandoned

Micah for at least 6 months prior to his incarceration, and in finding that adoption was in Micah's best interests. But the county court erred when it failed to comply with §§ 43-107 to 43-109 when granting the adoption.

We therefore affirm the county court's finding of active efforts, abandonment, and best interests of the child. However, we vacate the decree of adoption and remand the cause to the county court. On remand, the county court shall provide Linda and Daniel the opportunity to comply with §§ 43-107 to 43-109. The county court shall make the ultimate determination of compliance with §§ 43-107 to 43-109 and proceed accordingly. If the county court proceeds to enter a decree of adoption, the county court shall be bound by this court's determinations in regard to active efforts, abandonment, and best interests of the child factors already litigated.

Affirmed in part, and in part vacated
and remanded with directions.