IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE ADOPTION OF AUTUMN G.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE ADOPTION OF AUTUMN G.

JOSHUA C., APPELLANT,

V.

JORDAN G., APPELLEE.

Filed October 1, 2019.    No. A-18-954.

Appeal from the County Court for Hall County: ARTHUR S. WETZEL, Judge. Affirmed.

Vikki S. Stamm, of Stamm Romero & Associates, P.C., L.L.O., for appellant.

Erin M. Urbom, of Bradley Law Office, P.C., for appellee.

MOORE, Chief Judge, and PIRTLE and WELCH, Judges.

PIRTLE, Judge.

## INTRODUCTION

Joshua C. appeals from an order of the county court for Hall County finding that he, as a stepparent, could not adopt Autumn G. The trial court found that Joshua failed to show by clear and convincing evidence that Jordan G., Autumn's biological father, had abandoned Autumn and it dismissed Joshua's petition for adoption. Based on the reasons that follow, we affirm.

## BACKGROUND

Jordan and Lindsey C. are the biological parents of Autumn, born in October 2011. They were divorced in December 2016. Joshua is Lindsey's husband, who wants to adopt Autumn.

- 1 -

On January 8, 2018, Joshua filed a petition for adoption. The petition alleged that Jordan had not had a visit with Autumn for 1½ years and she had resided with Joshua and Lindsey since December 2016.

A trial on the matter was held in September 2018. Joshua asked the court to terminate Jordan's parental rights based on abandonment and to allow him to adopt Autumn.

The evidence showed that Jordan had a drug addiction which began in 2010. He had suffered a back injury while serving in the military and started taking prescribed narcotics for the pain. After becoming addicted to the narcotics, he also became addicted to marijuana and methamphetamine.

Jordan testified that in June 2017, he was arrested for attempted possession of a controlled substance and was in jail until mid-July. He then went to a treatment facility for substance abuse in Grand Island, Nebraska, where he remained for 2 months. He was then transferred to a facility in South Dakota because he was also suffering from post-traumatic stress disorder as a result of a roommate committing suicide. He was in South Dakota at the time the petition for adoption was filed.

After the petition was filed, he left the facility in South Dakota without completing treatment, moved to Grand Island, and checked himself into an inpatient treatment facility. At the time of trial, he was living in Lincoln and participating in outpatient treatment.

Jordan testified that during much of the time he was in the Grand Island and South Dakota facilities in 2017, he only had limited access to a phone but was able to make some calls to Lindsey to try to talk to Autumn. He eventually was able to set up an account through Verizon and started calling Lindsey every other week. Jordan testified that Lindsey would not answer the phone when he called or she would hang up as soon as she realized it was him calling. He claimed that he also tried to contact Lindsey through Facebook and email.

In December 2017, he received paperwork asking him to consent to Joshua adopting Autumn, which he refused to sign. He testified that after that, he started calling Lindsey on a daily basis, as well as texting her.

Jordan testified that at the time of trial he had not talked to Autumn for 1½ years and had not seen her for nearly 3 years. He also stated that he had not sent Autumn any cards or gifts in the last 3 years, but claimed it was because he did not have an address for Autumn. He acknowledged that his parents were having visits with Autumn and they would send him pictures of her. He did not ask his parents for Autumn's address because he thought they did not want him to have it. He also testified that his parents did not know where Autumn lived. Jordan further testified that in the 6 months before the petition was filed he called various schools trying to find out what school Autumn was attending and where she was living.

Jordan testified that he, Lindsey, and Autumn lived together from the time Autumn was born in October 2011 until he and Lindsey separated in October 2015. He testified that during that time, Autumn was "daddy's little girl." He stated that he and Autumn would go fishing, go on bike rides, cook together, plant flowers, go to the park, and play together. Jordan's parents both testified that Jordan loves Autumn and that Jordan was a good father in the past. His mother testified that he and Autumn had a strong bond.

Jordan and Lindsey's dissolution decree gave Lindsey custody and awarded Jordan supervised visitation every other Sunday. He stated that he has not exercised his visitation because he did not have anyone who would supervise it. Lindsey testified that when she and Jordan first separated Jordan had visitation every other weekend for the full weekend. She also testified that there was a period of time where she and Jordan had joint custody where each party had custody on alternating weeks. Jordan testified that he and Lindsey shared custody when the parties separated. Jordan acknowledged that prior to March 2018, he had not made any child support payments as ordered in the decree.

Lindsey testified that Jordan's first supervised visit took place on June 5, 2016, and it was supervised by his mother. During the visit, Jordan tried to leave with Autumn and his mother eventually called the police. Lindsey stated that this was the last time Jordan had seen Autumn. Lindsey testified that Jordan's next attempt to contact Autumn after the June 5, 2016, visit was a phone call on Autumn's birthday in October. Autumn did not want to talk to Jordan at that time and Lindsey did not make her. Lindsey testified that there were no further phone calls or contact from Jordan until February 13, 2017. Between February 13 and mid-March, Jordan called Lindsey about every other day and he spoke with Autumn during these calls. Lindsey testified that in mid-March, Jordan stopped calling.

Lindsey testified that she got an email from her attorney on May 30, 2017, stating that Jordan wanted to have visits with Autumn supervised by his mother. Lindsey testified that she was not comfortable with Jordan's mom supervising and she subsequently talked to Jordan's mom who told Lindsey she had not agreed to supervise visits.

Lindsey testified that Jordan's next attempt to contact Autumn was a phone call in early August 2017. Lindsey asked him to call back the next day, but he did not. There was no contact from Jordan between August and December 2017. His next contact was a phone call on Christmas Eve. Lindsey asked him to call back the next day because they were on their way to a Christmas party. He did not call the next day. His next call was on January 5, 2018.

Lindsey testified that after the petition was filed in January 2018, Jordan started calling nearly every day, sometimes several times per day. She testified that she would either not answer his calls or she would answer and hang up when he called. She stated that when Jordan first started calling again she would ask Autumn if she wanted to talk to him and Autumn always said she did not, so Lindsey stopped asking her.

Lindsey testified that Jordan's parents see Autumn on a regular basis and she is supportive of Autumn's relationship with them. She testified that Jordan's parents have always known her address and they never told her that Jordan did not have her address. She also testified that Jordan has not sent any cards or packages to Autumn at her home.

Jordan's father testified that Lindsey never told him not to tell Jordan where she lived and he assumed Jordan knew where she lived. He testified that sometime after November 2017, he realized that Jordan did not know where Lindsey lived and he gave Jordan her address.

Jordan's mother testified that on one occasion Jordan gave her a snack and pictures that he drew to give to Autumn. She testified that Jordan and Lindsey both told her that Jordan had made calls to Lindsey to try to talk to Autumn between July 2017 and January 2018, the 6 months before

the petition was filed. She also testified that in the 6 months before trial, he had been calling more frequently.

Following trial, the trial court found that Jordan had not abandoned Autumn and that it was not in Autumn's best interests to terminate Jordan's parental rights. The trial court subsequently entered an amended journal entry finding that Joshua failed to prove by clear and convincing evidence that Jordan had abandoned Autumn and dismissed the petition for adoption.

ASSIGNMENTS OF ERROR

Joshua assigns that the trial court erred in (1) finding that Jordan had just cause and excuse for abandonment and (2) finding that termination of Jordan's parental rights was not in Autumn's best interests.

STANDARD OF REVIEW

Appeals in adoption proceedings are reviewed by an appellate court for error appearing on the record. When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *In re Adoption of Micah H.*, 301 Neb. 437, 918 N.W.2d 834 (2018).

ANALYSIS

*Abandonment.*

Joshua first assigns that that the trial court erred in finding that there was just cause and excuse for Jordan's abandonment of Autumn.

Generally, for a court to grant an adoption petition, Neb. Rev. Stat. § 43-104(1) (Reissue 2016) requires that the biological parent of the child must execute written consent to the adoption. However, under § 43-104(2)(b), consent is not required when a parent has "abandoned the child for at least six months next preceding the filing of the adoption petition."

In order for a court to find that abandonment has occurred, the petitioning party bears the burden of proving by clear and convincing evidence that the parent abandoned the child. *In re Adoption of Micah H., supra.* The Nebraska Supreme Court has defined the word "abandoned" when used in the context of adoption proceedings. To constitute abandonment, it must appear that there has been, by the parents, a giving up or total desertion of the minor child. *Id.* In other words, there must be shown an absolute relinquishment of the custody and control of the minor and thus the laying aside by the parents of all care for the minor. *Id.* The Supreme Court has further noted that abandonment may be found where there is willful or intentional conduct on the part of the parent which evinces a settled purpose to forgo all parental duties and relinquish all parental claims to the child, or a willful neglect and refusal to perform the natural and legal obligations of parental care and support. *Id.*

The conduct constituting abandonment as defined above must appear by clear and convincing evidence to be willful, intentional, or voluntary, without just cause or excuse. *Id.* As a general rule, adoption statutes will be construed strictly in favor of the rights of the natural parents in controversies involving termination of the relation of the parent and child. This is especially

true in those cases where it is claimed that owing to the willful abandonment of the child, the consent of the parent to the adoption is not required. *Id.*

Pursuant to § 43-104(2)(b), the critical period of time during which abandonment must be shown is the 6 months immediately preceding the filing of the adoption petition. However, various definitions of abandonment do not require us to view this statutory period in a vacuum. One may consider the evidence of a parent's conduct, either before or after the statutory period, because this evidence is relevant to a determination of whether the purpose and intent of that parent was to abandon his or her child or children. *In re Adoption of Micah H.*, 301 Neb. 437, 918 N.W.2d 834 (2018).

Joshua argues that the court erred in finding that there was just cause and excuse for Jordan's abandonment of Autumn. As previously stated, the conduct constituting abandonment must appear by clear and convincing evidence to be willful, intentional, or voluntary, without just cause or excuse. *Id.* At the end of trial, the court explained and pronounced its decision and in doing so, concluded there was just cause or excuse for abandonment. The court relied on a provision in Lindsey and Jordan's divorce decree which provided that the parties agreed that "[Jordan's] current situation, consisting of criminal actions and his mental health, indicates that [Jordan] needs to address his issues prior to being involved in the parenting of the child." The court noted that this was something the parties agreed upon and that it had heard no evidence that Jordan's mental health issues or chemical dependency had been addressed in their entirety. The court found that the provision in the decree was just cause or excuse for abandonment.

Assuming without deciding that the court erred in finding just cause or excuse for abandonment based on the provision in the decree referenced above, we conclude that the trial court did not err in finding that Joshua failed to prove by clear and convincing evidence that Jordan abandoned Autumn. Pursuant to § 43-104(2)(b), the critical period of time during which abandonment must be shown is the 6 months immediately preceding the filing of the adoption petition. *In re Adoption of Micah H., supra.* The evidence showed that in the 6 months before the petition was filed (July 8, 2017, to January 8, 2018), Jordan had limited access to a telephone while he was in Grand Island and in South Dakota, but did make some calls to Lindsey. He eventually was able to call every other week from South Dakota. His treatment began in July 2017 and hindered his ability to have contact with Autumn.

Jordan also testified that he did not know where Autumn was living and called different schools to try to find her. Jordan's father testified that around November 2017, he realized Jordan did not know where Autumn was living. There was also evidence that Jordan called Lindsey in an effort to talk to Autumn in August 2017, Christmas Eve 2017, and January 5, 2018.

As previously stated, evidence of a parent's conduct before and after the statutory 6-month period is also relevant to determine whether the purpose or intent of the parent was to abandon the child. See *id.* In considering time prior to the 6-month timeframe, there was evidence that Jordan and Autumn had a close relationship for the first 4 to 5 years of Autumn's life. Jordan lived with Autumn until she was 4 years old and saw her on a regular basis after the parties separated, having joint custody for a period of time. Jordan testified that he and Autumn would play and do various activities together. Jordan's parents both testified that Jordan loves Autumn and that Jordan was a good father in the past. His mother testified that he and Autumn had a strong bond.

There was also evidence that after Jordan's last visit with Autumn in June 2016, Jordan called Autumn on her birthday in October 2016, and he called and talked to Autumn every other day between mid-February and mid-March 2017.

After the petition was filed, Jordan tried to call Autumn every day but Lindsey would not answer the phone or would hang up on him. Jordan's mom testified that on one occasion Jordan gave her a snack and pictures that he drew to give to Autumn. She did not state when this occurred.

To constitute abandonment, it must appear that there has been, by the parents, a giving up or total desertion of the minor child. *In re Adoption of Micah H., supra.* The question of abandonment is largely one of intent to be determined in each case from all the facts and circumstances. *In re Adoption of David C.*, 280 Neb. 719, 790 N.W.2d 205 (2010). Further, adoption statutes will be construed strictly in favor of the rights of the natural parents in controversies involving termination of the relation of the parent and child. *Id.* Based on the record before us, Jordan has not given up or totally deserted Autumn. Although his efforts to have contact with Autumn have been sporadic and limited, and his actual contact nominal, the evidence is not clear and convincing that Jordan had abandoned Autumn.

*Best Interests.*

Joshua next assigns that the trial court erred in finding that termination of Jordan's parental rights was not in Autumn's best interests. He primarily focuses on the lack of contact between Jordan and Autumn in arguing that the adoption is in Autumn's best interests.

A determination regarding parental consent, a finding under § 43-104(2), or a determination regarding substitute consent does not end the court's inquiry as to whether the petition for adoption should be approved. Upon a hearing, if the statutory requirements are otherwise satisfied, the court may decree an adoption after finding that such adoption is in the best interests of the child. *In re Adoption of Micah H.*, 301 Neb. 437, 918 N.W.2d 834 (2018).

Because we have concluded that Joshua did not prove that Jordan had abandoned Autumn by clear and convincing evidence, we need not address whether adoption is in Autumn's best interests. See *Weatherly v. Cochran,* 301 Neb. 426, 918 N.W.2d 868 (2018) (appellate court is not obligated to engage in analysis not necessary to adjudicate case and controversy before it).

## CONCLUSION

We conclude that the trial court did not err in finding that Jordan had not abandoned Autumn and, therefore, did not err in dismissing Joshua's petition for adoption. Accordingly, the court's amended journal entry is affirmed.

AFFIRMED.