IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF AVIYANAH S.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF AVIYANAH S., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

NATHANIEL V., APPELLANT.

Filed January 15, 2019.    No. A-18-471.

Appeal from the County Court for Scotts Bluff County: KRIS D. MICKEY, Judge. Affirmed.

Kirk M. Fellhoelter, of Douglas, Kelly, Ostdiek, Snyder, Ossian, Vogl & Snyder, P.C., for appellant.

No appearance for appellee.

MOORE, Chief Judge, and RIEDMANN and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Nathaniel V. appeals the decision of the Scotts Bluff County Court, sitting in its capacity as a juvenile court, terminating his parental rights to his daughter, Aviyanah S. He contends that the State did not make active efforts to reunite him with Aviyanah and that termination was not in Aviyanah's best interests. For the reasons set forth herein, we affirm.

- 1 -

## II. STATEMENT OF FACTS

### 1. AVIYANAH'S BIRTH AND REMOVAL

Elizabeth J. gave birth to Aviyanah in October 2017. After receiving notice that Aviyanah was a drug-exposed infant and had not received prenatal care, a member of the Department of Health and Human Services' (DHHS) initial assessment team met Elizabeth at the hospital later that same day. Elizabeth admitted using methamphetamine 2 days prior to Aviyanah's birth and identified Nathaniel as Aviyanah's father. Nathanial was not present at Aviyanah's birth due to his incarceration. Upon Aviyanah's release from the hospital, she was placed in foster care and has not been returned to either of her parents' care.

### 2. FILING OF PETITIONS FOR ADJUDICATION AND TERMINATION

On October 31, 2017, the State filed a petition for adjudication alleging that Aviyanah was a child within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). Specifically, the State alleged Aviyanah lacked proper parental care by reason of the fault or habits of her parents due to her parent's use of controlled substances which placed her at risk of harm or deprived her of necessary parental care and because her father was currently incarcerated. That same day, Aviyanah was placed in the emergency temporary custody of the DHHS. Elizabeth voluntarily relinquished her parental rights to Aviyanah. Accordingly, we reference Elizabeth only when necessary to set forth the pertinent facts relevant to Nathaniel's appeal.

Nathaniel's paternity was legally determined on January 11, 2018. At the end of January, the State filed a motion to terminate his parental rights on the basis that he had abandoned Aviyanah for 6 months or more immediately prior to the filing of the petition, that he had substantially and continuously or repeatedly neglected and refused to give Aviyanah or a sibling necessary parental care and protection, and termination was in Aviyanah's best interests. See Neb. Rev. Stat. § 43-292(1) and (2) (Reissue 2016). Nathaniel denied the allegations and filed a motion to determine the applicability of the Nebraska Indian Child Welfare Act (NICWA) on the basis that Elizabeth was an enrolled member of the Rosebud Sioux Tribe. The court found that the NICWA applied to this case.

Shortly thereafter, the State filed an amended petition alleging that Aviyanah lacked proper parental care by reason of the faults or habits of Nathaniel due to his use of, or possession of, controlled substances which placed Aviyanah at risk of harm and/or deprived her of necessary parental care. See § 43-247(3)(a). The petition also alleged that termination of Nathanial's parental rights was appropriate because he had abandoned Aviyanah for 6 months or more immediately prior to the filing of the petition; that he had substantially and continually or repeatedly neglected and refused to give Aviyanah necessary parental care and protection; that he was unfit by reason of debauchery, habitual use of intoxicating liquor or narcotic drugs, or repeated lewd and lascivious behavior, which conduct was seriously detrimental to Aviyanah's health, morals, or well-being; that he had subjected Aviyanah or another minor child to aggravated circumstances, i.e., abandonment; and that it was in Aviyanah's best interests that his parental rights be terminated. See § 43-292(1), (2), (4), and (9). Finally, the petition alleged that Aviyanah was a minor child of Native American heritage subject to NICWA and active efforts had been made to provide remedial

services and rehabilitative programs to prevent the breakup of the Indian family and those active efforts had been unsuccessful.

### 3. COMBINED ADJUDICATION AND TERMINATION HEARING

The court held a combined adjudication and termination hearing on April 11, 2018. The State presented several exhibits including four cases where Nathaniel was convicted for possession of methamphetamine, a case where he was charged with first degree assault and convicted of witness tampering, and a juvenile court case where Nathaniel's parental rights to another child were terminated.

### (a) Theresa Stands

Theresa Stands testified as the ICWA expert for the State. Stands testified that she is an enrolled member of the Lakota Sioux tribe and has raised her children and grandchildren to be aware of their Lakota Sioux heritage. She recently retired after working for the Scottsbluff Public Schools in Title VII Indian education for 36 years, but just returned to the school to work with Native American students 2 days per week. She advocates for Native American students and their families with the Scottsbluff school system to bridge gaps between the school and families, works with attendance, and performs home visits. Stands has also coordinated a Lakota language class, started a Lakota reading program, worked with a traditional Native American dance group, and has worked with the ICWA program. Stands reviewed Aviyanah's file which included court reports, police reports, and hospital reports. She determined that Aviyanah was eligible for enrollment in the Rosebud Sioux Tribe which is part of the larger Lakota Sioux Nation.

Stands testified that the culture of the Lakota Sioux involves the concept of the extended family. The child's parents provide for a child's basic needs such as food and clothing, provide discipline, and teach the child the correct path in life. Aunts and uncles support the parents and, at times, come in when the parents cannot be there for the child. Cousins are treated as siblings and grandparents share their wisdom and knowledge with their grandchildren. Stands expressed concern about Nathaniel's ability to parent due to his drug use "[b]ecause you can't parent a child when you're in the middle of addictions because children should be your first priority. And any time someone has addictions, [the children are] not [their] first priority." Stands testified that drug use and addiction are not cultural to the Lakota Sioux and that placing a child in a situation where he or she would be exposed to a drug-using parent is not compatible with Lakota Sioux culture and norms. Likewise, Stands stated that assaultive behavior is not part of the Lakota Sioux culture and that children and women were never hit or abused. Stands stated "Lakota children are considered unique and special, and they should be nurtured and taken care of." Stands confirmed that her testimony regarding the role of the family and the importance of children in the Lakota Sioux Tribe is also applicable to the Rosebud Sioux Tribe.

### (b) Cassie Beasant

DHHS child and family service specialist Cassie Beasant testified that she has been Aviyanah's caseworker since January 2018. She testified that once paternity was established, she set up services for Nathaniel including supervised visitation, drug testing, and family support visits

which are one-on-one visits where Nathanial could receive help with job searches, budgeting, housing, and parenting skills. Nathaniel was offered, and was attending, 2 hours of one-on-one family support and 6 hours of supervised visitation with Aviyanah. Beasant testified that the week prior to the hearing was the only time Nathaniel had missed the visits. He did not provide an explanation for missing the visits. Near the end of February 2018, Nathaniel requested parenting classes tailored to infants and young children. Although Beasant spoke with Nathaniel about starting the Love and Logic class, the 1-2-3 Magic class, and the Circle of Security class, he had not taken any of those classes as of the date of the hearing.

Beasant testified that, based on her time with the DHHS, the parenting concerns involved in cases where the parent or parents are methamphetamine users are the continued drug use, the instability for the child, repeated incarceration, and the parent's association with unsafe people. Beasant testified that the majority of her cases involve methamphetamine use and that it is not something that is easily corrected. According to Beasant, in overcoming a substance like methamphetamine, "[i]t depends on how heavy the use is, how bad the addiction is, how long a treatment, residential or outpatient, whatever is more successful, for that particular person, and then sustaining sobriety can take months, maybe a couple of years to sustain that." Beasant stated that Nathaniel had not requested treatment for his methamphetamine addiction and the DHHS cannot "recommend a treatment, residential, for any client without an evaluation recommending it or the parent specifically stating that's what they want." Beasant testified that the services provided to Nathaniel were based on what he identified as his needs and that he never requested assistance with phone, gas, or food vouchers.

Beasant testified that she observed two visits between Nathaniel and Aviyanah: one in February 2018 and one in the beginning of March. She testified that Nathaniel was attentive to Aviyanah, held her appropriately, looked at her, engaged with her when she looked at him, and talked with her. He brought a diaper bag to the visits with clothes, diapers, baby wipes, and a few toys.

Beasant's concerns were with Nathaniel's continued methamphetamine use and the fact that Nathaniel did not seem committed to addressing his substance abuse. She testified that this created instability for Aviyanah, the possibility of incarceration for Nathaniel, and that Nathaniel's interaction with unsafe, unstable people created an unsafe environment for Aviyanah.

### (c) Melissa Buhr

Specialized Substance Abuse Supervision Officer Melissa Buhr testified that she is a probation officer for high-risk offenders. In December 2017, Nathaniel was sentenced to 24 months' probation and she was assigned as his probation officer. As part of Nathaniel's probation, he was not to commit any new law violations, he was to report as directed to the probation office, to maintain full-time employment, to remain in Nebraska, not to possess any alcohol or controlled substances, and not allowed to possess any firearms or illegal weapons. Further, Nathaniel was subject to random drug testing and was to complete the specialized substance abuse supervision requirements and he was subject to searches of his residence vehicle and/or person at the request of a probation officer. On February 1, 2018, Buhr and a police officer conducted one of the permitted searches of Nathaniel's residence. In Nathaniel's room, they found a digital scale with

a crystallized substance on the plate of the scale. The substance field-tested positive for methamphetamine. As a result of this search, Nathaniel was charged with possession of methamphetamine, which case was pending the time of the combined adjudication and termination hearing.

As part of Nathaniel's probation, he was to report to Buhr for weekly meetings. Buhr testified that his attendance at the weekly meetings was "pretty sporadic" and he had missed the meeting prior to the hearing. Further, although Nathaniel reported to Buhr that he was employed, she was not able to verify his employment and he had not been attending his counseling appointments. Buhr also stated that, although Nathaniel was going in for his drug tests, his pass rate was inconsistent and he tested positive for methamphetamines the night before the hearing. Buhr further expressed concern about the validity of the drug tests that Nathaniel did pass because Nathaniel admitted to his counselor that he was trying to "clean his system" by drinking a lot of water so that he could pass his drug tests. Buhr also stated that Nathaniel mentioned getting into treatment "maybe once, but there was no follow-through with that." Buhr testified "[a]t this point I feel [Nathaniel] is just trying to get though his probation and not really address his addiction."

### (d) Nathaniel's Testimony

Nathaniel testified that, during his visits with Aviyanah, he holds her, feeds her, changes her diaper, talks to her, and plays with her and that he thinks Aviyanah recognizes him. He stated that he brings a diaper bag to the visits which is packed with diapers, baby wipes, formula, clothes, and toys. He testified that he loves Aviyanah and wants what is best for her. He testified that the people at the visitation center helped him with rides for visits with Aviyanah and for his job search. Nathaniel testified that he found a full-time job as a customer service representative earning $12 per hour with medical benefits. The job was to begin the Monday following the hearing and Nathaniel stated that he had already completed the drug screening for that job. He further testified that he had signed up for a men's awareness class, a parenting class, and an anger management class.

Nathaniel testified that he missed the previous week's visits with Aviyanah because he was sick. He admitted that he is an addict, he has been an addict for 3 years, and he is waiting on a bed for treatment at the St. Francis Center. Although Nathaniel has four convictions for possession of methamphetamine with the earliest dating back to 2011, Nathaniel stated that during his early convictions for possession of methamphetamine, he was not using, he was just carrying methamphetamine around and got caught with it.

Nathaniel testified that, besides Aviyanah, he has four other children with his parental rights to a fifth child having been terminated. Two of his children live in North Platte and he admitted he only has telephone contact with them. There was disputed testimony regarding Nathaniel's contact with his child, Travis. Travis' mother testified that she lets Travis see Nathaniel when Travis asks which she stated was five or six times in the year prior to the hearing. She also testified that Nathaniel had called Travis "a couple times" during that same timeframe with the most recent call being about 3 weeks before the hearing. Nathaniel testified that he sees his son, Travis, every other weekend and that Travis' mother lied about the amount of time he spent with Travis. Nathaniel does not have any contact with his fourth child who is approximately

1 year old. Nathaniel's parental rights to his fifth child had previously been terminated. In that case, Nathaniel previously worked on a case plan with the DHHS. Nathaniel admitted that he had been incarcerated during the majority of time during that case and, in that case, the juvenile court noted that Nathaniel had three previous convictions for possession of marijuana. He further admitted that, during the course of the case, he had completed an intensive outpatient treatment program but that he had another possession charge after his rights were terminated and admitted to another possession charge pending against him. Nathaniel testified that "ever since I got put on probation I have been talking about getting into some kind of treatment. And, matter of fact, I have been talking about it for a while." He testified he did not ask Buhr to help him find applications for treatment facilities, but he did tell family support workers that he was looking into treatment.

When the State's attorney asked Nathaniel "What makes you think your circumstances now are different than what they were at the time of your previous termination that would make this court think that you could provide for Aviyanah's needs?" Nathaniel responded that the last time he was released from incarceration, he had very little time to prove himself. He continued, "I think that I can work on the problem that I have . . . because . . . I haven't really worked on it." Nathaniel testified that he believed he would be ready to take care of Aviyanah full time in 6 months to 1 year.

### (e) Mark Sinner

Mark Sinner, the Scotts Bluff County Attorney's Office child support enforcement officer, testified that Nathaniel had two open child support cases on the day prior to the termination hearing. According to Sinner, one of the open cases involved two dependent children. In that case, Nathaniel was ordered to pay $91.79 in monthly child support and was in arrears in the amount of $8,009.66. In the other open case, Nathaniel also had two dependent children he was ordered to pay $94.68 in monthly child support, and was in arrears in the amount of $7,700.37. Sinner also testified that there was another child support case pending regarding Nathaniel, but he provided no additional information regarding that case.

### (f) Nathaniel's Mother

Nathaniel's mother testified that she took Nathaniel to visitations five times and, in the interactions she observed between Nathaniel and Aviyanah, Nathaniel was acting appropriately. During the visits, Nathaniel would make bottles for Aviyanah, burp her, change her diaper, and comfort her when she cried. She also testified that she helped provide the diapers, baby wipes, and other contents of the diaper bag that Nathaniel brings to the visitations with Aviyanah.

### 4. COURT'S ORDER

The court found, by a preponderance of the evidence, that Aviyanah was a child within the meaning of § 43-247(3)(a) due to Nathaniel's faults or habits, specifically his use of, or possession of, controlled substances which placed Aviyanah at risk of harm and/or deprived her of necessary parental care. The court noted that the evidence demonstrated that, at the time Aviyanah was born, Nathaniel was incarcerated on drug charges and he remained incarcerated for at least a month after her birth, which prohibited him from providing her with necessary parental care.

The court further found that clear and convincing evidence existed to terminate Nathaniel's parental rights pursuant to § 43-292(2) and (4), but that the State did not prove grounds for termination pursuant to § 43-292(1) and (9). The court further found that termination was in Aviyanah's best interests and that active efforts have been made to provide remedial services and rehabilitative programs, although unsuccessfully, to prevent the breakup of the Indian family. Specifically, the court found:

This is not a father who is unfamiliar with what happens when a parent fails to discharge his parental responsibilities. The evidence is overwhelming as it relates to drug use by this father. The father admitted he is an addict. He has failed to participate in drug testing, albeit in a probation case. He has admitted to masking his tests at times. He failed a drug test the day before the termination trial. The Court was presented with numerous drug-related convictions for this father over the past seven years. His addiction has led to his incarceration. In fact, he was incarcerated when this child was born and again, later, on probation sanctions. He has a new pending case and therefore, is facing potential incarceration again. . . . Even outside of the possibility for incarceration, the father's habitual use of narcotic drugs places the child at risk because of her father's continued contact with those involved with the drug culture. The father has been unable and unwilling to maintain a life consistently free of illegal substances. In the face of the totality of the evidence, the court believes the prospect of reunifying this father with this child is extraordinarily poor given the father's length of addiction and the absence of any meaningful treatment. His testimony to the court that he is seeking treatment now seems best characterized as "too little, too late," particularly given the lack of concrete evidence about when, where, and how long this treatment will be.

Further, the court stated:

As it pertains to neglect, the evidence suggests the father himself needs shelter as he currently lacks housing of his own. The evidence suggests that on one occasion, he purchased some supplies for the child, although there is some conflict about what items he purchased since his mother testified she was the one who purchased the items to fill the diaper bag. Parenting skills include examining a parent's ability to implement measures to protect their child, maintain a healthy lifestyle, make proper choices about persons involved in the child's life, provide stable housing, and provide consistent financial support. [Nathaniel] is not consistently employed. He missed an entire week of visits the week before his termination of parental rights trial. The various aspects of parenting that require a sustained, consistent demonstration of love, discipline, and emotional support are simply absent when it comes to [Nathaniel].

The court also found proof beyond a reasonable doubt that continued custody of Aviyanah by Nathaniel was likely to result in physical and emotional harm to the child if a relationship continues with Nathaniel given his 7-year history with methamphetamines, as well as "his vacillating level of interest in parenting." The court further found that active efforts had been made which the court identified as ICWA-compliant placement, family support, transportation, and

supervised parenting time. In reference to Nathaniel, the court noted "one cannot lead what refuses to be [led.]" Finally, the court found that Stands was a qualified expert witness as contemplated by the ICWA. The court noted that Stands testified that alcohol and substance abuse are neither traditional nor cultural and drug use by a parent makes a child something other than the first priority, which she testified was dangerous and unacceptable. The court continued, noting Stands' testimony that, in Sioux culture, parents are responsible for the day-to-day effort involved in raising children, including protecting them and preparing them for adulthood. The court found beyond a reasonable doubt, based upon the evidence adduced at trial, and Stands' opinion testimony, that the continued custody of Aviyanah by Nathaniel was likely to result in serious emotional or physical damage to the child.

### III. ASSIGNMENTS OF ERROR

Nathaniel assigns that the juvenile court committed reversible error in finding the State established by clear and convincing evidence that active efforts had been made to reunite the family. He also assigns that the court committed reversible error in finding the State established by clear and convincing evidence that termination of his parental rights is in Aviyanah's best interests.

### IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Giavonna G.*, 23 Neb. App. 853, 876 N.W.2d 422 (2016). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *In re Interest of Jade H. et al.*, 25 Neb. App. 678, 911 N.W.2d 276 (2018).

### V. ANALYSIS

Before addressing Nathaniel's assigned errors, we note that Nathaniel has not assigned any error with respect to the juvenile court's findings that statutory grounds for termination exist and that custody will result in serious emotional or physical damage to Aviyanah.

To terminate parental rights, the State must prove by clear and convincing evidence that one or more of the statutory grounds listed in § 43-292 have been satisfied and that termination is in the child's best interests. *In re Interest of Walter W.*, 274 Neb. 859, 744 N.W.2d 55 (2008). Clear and convincing evidence is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of the fact to be proven. *In re Interest of Jagger L.*, 270 Neb. 828, 708 N.W.2d 802 (2006).

NICWA, however, adds two additional elements the State must prove before terminating parental rights in cases involving Indian children. *In re Interest of Walter W., supra.* First, the State must prove by clear and convincing evidence that active efforts have been made to prevent the breakup of the Indian family and that these efforts have proved unsuccessful. See, Neb. Rev. Stat. § 43-1505(4) (Reissue 2016); *In re Interest of Walter W., supra.* Second, the State must prove by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the

continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child. See § 43-1505(6).

We have conducted a de novo review of the record and find no plain error as to the statutory elements for termination of parental rights. The State proved by clear and convincing evidence that termination of Nathaniel's parental rights was warranted pursuant to § 43-292(2) and (4). Additionally, the State proved by evidence beyond a reasonable doubt, through the evidence adduced at the termination hearing including Stands' testimony, that Nathaniel's custody of Aviyanah was likely to result in serious emotional or physical damage to the minor child. We now turn to Nathaniel's specific assignments of error.

## 1. ACTIVE EFFORTS

Nathaniel first assigns that the State did not meet its burden of proving, by clear and convincing evidence, that sufficient "active efforts" were made as required by § 43-1505(4).

Section 43-1505(4) provides:

Any party seeking to effect a . . . termination of parental rights to, an Indian child under state law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family or unite the parent or Indian custodian with the Indian child and that these efforts have proved unsuccessful. . . . Prior to the court ordering . . . the termination of parental rights, the court shall make a determination that active efforts have been provided or that the party seeking placement or termination has demonstrated that attempts were made to provide active efforts to the extent possible under the circumstances.

The "active efforts" standard requires more than the "reasonable efforts" required under Neb. Rev. Stat. § 43-283.01 (Supp. 2017). *In re Interest of Walter W., supra.* There is no precise formula for active efforts; the active efforts standard requires a case-by-case analysis and should be judged by the individual circumstances present in a case. *In re Adoption of Micah H.*, 301 Neb. 437, 918 N.W.2d 834 (2018). However, active efforts made under Neb. Rev. Stat. § 43-1503(1) (Reissue 2016) (defining "active efforts"), should generally be "'culturally relevant.'" *Id*. at 450, 918 N.W2d at 846, quoting *In re Interest of Walter W., supra*. Making active efforts does not require making every possible effort, and even if the DHHS has fallen short in some areas, that does not necessarily mean active efforts have not been made. See *In re Interest of Walter W., supra*. The "active efforts" element requires proof by clear and convincing evidence in parental rights termination cases. *Id*.

Efforts made in this case included facilitating supervised visits, providing family support hours, drug testing, offering parenting classes to Nathaniel, placing Aviyanah in a NICWA-compliant foster home, and taking steps to enroll Aviyanah in the Rosebud Sioux tribe. Additionally, Nathaniel was provided transportation to visitations and during his job search.

In connection with the active efforts requirement, the court specifically found:

[T]he department has made active efforts in this case.

While active efforts require more than reasonable efforts, there is no precise formula, I believe, under the case law for active efforts, but this child has been placed in

the appropriate placement and supervised visits have been offered and whatever issues this father wanted to be addressed by the department were addressed, that to include age-appropriate relationship skills and just how to deal with a -- an infant child.

The record is replete with efforts to contact him, to offer transportation, to set up family support and those sorts of things, and the response of this father has, in my opinion, been timid at best.

After our de novo review of the record, we agree with the county court. The State worked diligently with Nathaniel to provide remedial services and rehabilitative programs designed to prevent the breakup of Nathaniel's family. Notwithstanding those efforts, we find that Nathaniel has failed to make any progress in addressing his addiction and is in no better position to address or resolve his addiction than he was in the prior termination proceeding. We find that the active efforts requirement has been met and that this assignment of error is without merit.

## 2. BEST INTERESTS

Nathaniel also contends that the juvenile court erred in finding that termination of his parental rights is in Aviyanah's best interests.

Once a statutory basis for termination has been proved, the next inquiry is whether termination is in the child's best interests. *In re Interest of Giavonna G.*, 23 Neb. App. 853, 876 N.W.2d 422 (2016).

A parent's right to raise his or her child is constitutionally protected. Therefore, before a court may terminate parental rights, the State must show that the parent is unfit. There is a rebuttable presumption that the best interests of the child are served by having a relationship with his or her parent. Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to a child's well-being. The best interests analysis and the parental fitness analysis are fact-intensive inquiries, and while they are separate, each examines essentially the same underlying facts.

*In re Interest of Lizabella R.*, 25 Neb. App. 421, 436-37, 907 N.W.2d 745, 756 (2018).

In reviewing this record, we look to determine whether there is a personal deficiency or incapacity in Nathaniel which has prevented, or will probably prevent, performance of a reasonable parental obligation in raising Aviyanah which caused, or probably will result, in detriment to Aviyanah's well-being. Nathaniel's addiction to methamphetamine is central to our analysis here. Nathaniel admits that he has been an addict for three years. Contrary to his admitted timeframe, Nathaniel has convictions for possession of methamphetamine which date back to 2011 thereby establishing an issue of greater duration. Nathaniel has been through an intensive outpatient program, but admits that he has never really worked on his addiction. Even 3 months after learning that he was Aviyanah's father and, notwithstanding the assistance of DHHS and his prior

knowledge of the reunification process, Nathaniel did not seek treatment for his addiction or provide any meaningful indication that he intended to resolve his deficiencies. Nathaniel was incarcerated when Aviyanah was born in January 2018 and has again been incarcerated during her short life. Nathaniel has a new pending charge relating to methamphetamine and has done nothing to indicate an interruption of this cycle. Besides the difficulty of overcoming his addiction and the dubious evidence of his commitment to do so, his time spent in prison has already removed Aviyanah from his care and, considering the pending case against him, will probably do so again in the future.

In addition, Nathaniel has demonstrated that he has been unable to financially support Aviyanah or his other children. Not only did his mother help him buy the things he had for Aviyanah, but he is over $15,000 in arrears in child support payments. He reported procuring a full-time job that he said he was going to commence the Monday following trial, but the promise of financial stability still remains speculative in light of his addiction. He is not fulfilling all requirements of probation in that he has failed drug tests and missed meetings with his probation supervisor. He admitted to attempting to cleanse his system in order to manipulate the drug test results. He is not a consistent figure in the lives of four of his other children and has had his parental rights to one child terminated. He has a criminal record that goes beyond drug convictions and includes convictions for carrying a concealed weapon and witness tampering.

Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Walter W.*, 274 Neb. 859, 744 N.W.2d 55 (2008). We find that the evidence clearly and convincingly establishes that Aviyanah's best interests require the termination of Nathaniel's parental rights.

## VI. CONCLUSION

In sum, we find that Nathaniel's assigned errors lack merit and we affirm the order of the Scotts Bluff County Court, sitting in its capacity as a juvenile court, in its entirety.

AFFIRMED.